**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | No.  **1:22-CR-00409-SAG-1** |
| | § | |
| **WILSON ARTURO** | § | |
| **CONSTANZA-GALDOMEZ** *et al.* | § | |

**MOTION TO STRIKE THE GOVERNMENT'S NOTICE OF INTENT TO SEEK THE
DEATH PENALTY &**

**MEMORANDUM OF LAW IN SUPPORT**

The defendant, Wilson Arturo Constanza-Galdomez, moves this Court to strike the government's Notice of Intent to Seek the Death Penalty (ECF No. 94), filed on May 16, 2025.  In support of this motion, Mr. Constanza-Galdomez submits the following memorandum of law.

**TABLE OF CONTENTS**

I.    **Introduction**………………………………………………………………………..2

II.   **Background**…………………………………………………………………..…3

    A.  The Alleged Offense Conduct ……………………………………………………3

    B.  Relevant Events Between June 2020 and January 2025 ………………………….3

    C.  Events Following President Trump's January 20, 2025
       Executive Order and Attorney General Bondi's
       February 5, 2025 Directive to Federal Prosecutors ………………………………7

III.  **Legal Argument**…………………………………………………………………..11

    A.  This Court Should Strike the Government's May 16, 2025 Notice
       as Untimely……………………………………………………………………11

B.  Assuming this Court Treats the Government's
May 16, 2025 Notice as an Amended § 3593(a) Notice,
this Court Should Strike that Notice Because "Good Cause"
Does Not Exist…………….…………………………………………….....................24

C.  Section 3593(a) Does Not Authorize a Reversal
of Prior Decision by DOJ Not to Seek the Death Penalty………………………..31

D.  The Government's April 2024 Notice Affirmatively
Waived the Government's Ability to File a Notice
Under 18 U.S.C. § 3593(a)………………………………………………………35

E.  The Government Is Estopped from Filing a Notice
that It Intends to Seek the Death Penalty Under
18  U.S.C. § 3593(a)………………………………………………………………36

F.  Permitting the Government to Seek the Death Penalty
Would Violate the Fifth Amendment's Due Process Clause……………………41

G.  Permitting the Government to Seek the Death Penalty
Would Violate the Eighth Amendment's Cruel
and Unusual Punishments Clause………………………………………………43

H.  Permitting the Government to Seek the Death Penalty
Would Violate the Equal Protection Guarantee
in the Fifth Amendment's Due Process Clause…………………………………43

IV.    **Conclusion**………………………………………………………………………..45

## MEMORANDUM OF LAW

### I.
### Introduction

The government's May 16, 2025 notice of its intent to seek the death penalty 13 months after formally informing this Court, Mr. Constanza-Galdomez, and his appointed counsel that the government would *not* seek the death penalty (ECF No. 48) – and only 109 days before the firmly-scheduled jury trial – is an affront to fundamental constitutional, statutory, and equitable principles.  As discussed below:

2

• The government's notice was untimely.

• The government's notice, even if it were timely, is not supported by good cause because the government did not exercise reasonable diligence.

• The operative statute, 18 U.S.C. § 3593(a), does not permit the government to seek the death penalty after filing a prior formal notice that the government was *not* seeking the death penalty.  At the very least, as a matter of this Court's supervisory authority, it should prevent such a reversal.

• The government both *waived* its right to seek the death penalty and is *estopped* from seeking the death penalty under the circumstances of this case.

• It would violate due process, equal protection, and the Eighth Amendment to permit the government to seek the death penalty.

Just as the court recently did in *United States v. Spurlock*, No. 3:23-cr-00022, ___ F. Supp.3d___, 2025 WL 1360499 (D. Nev. May 9, 2025),[1] this Court should strike the May 16, 2025 notice and prohibit the government from seeking the death penalty against Mr. Constanza-Galdomez.

## II.
## Background

### A.  The Alleged Offense Conduct

According to the allegations in the superseding indictment, in the spring of 2020, Mr. Constanza-Galdomez and several indicted and unindicted coconspirators engaged in violent acts towards several other people as part of alleged racketeering activity – including committing the murders of persons identified as Victim 3 and Victim 4.  ECF No. 90, at 11-14.

### B.  Relevant Events Between June 2020 and January 2025

In June 2020, Mr. Constanza-Galdomez and his codefendants were arrested on state charges closely related to some of the later-filed federal charges and detained without bond.  ECF Nos. 87 & 88.  At the time that the state charges were filed in the summer of 2020 or soon thereafter, the U.S. Department of Justice – during the final year of President Trump's first term –

---

[1] On May 12, 2025, the government filed notice of a possible interlocutory appeal of the district court's order in *Spurlock* to the Ninth Circuit (No. 25-3040).

had a basis to bring federal capital charges under 18 U.S.C. § 1959(a)(1) concerning the murders of Victims 3 and 4. That is because, on June 12, 2020, the FBI concluded that Mr. Constanza-Galdomez and his codefendants committed the murders in connection with the MS-13 gang. **Exhibit A** (redacted FBI's June 12, 2020 "Case Opening" memorandum).[2] The memorandum stated: "Agents will work with the United States Attorney's Office to charge the violent acts associated with the organization federally under the Racketeer Influenced and Corrupt Organizations RICO Act." *Id.* at 6.

The defendants remained in state custody until November 2022, when a federal grand jury returned the original federal indictment. That 19-page indictment charged a complex 2.5-year conspiracy to engage in multiple racketeering acts in violation of 18 U.S.C. § 1962(d) – including the murders of Victim 3 and Victim 4 as racketeering acts – but did not include any death-penalty-eligible charges under § 1959(a)(1). ECF No. 1.

Based on procedural requirements set forth in the Department of Justice's *Justice Manual*, the U.S. Attorney's Office was required to notify DOJ's Capital Case Section in Washington, D.C., of the original indictment because, although its charges did not authorize the death penalty, it alleged "conduct that could be, but has not been, charged as a capital offense." JUSTICE MANUAL § 9-10.180, available at: https://www.justice.gov/jm/jm-9-10000-capital-crimes#9-10.030. For that reason, when the original indictment was filed in late 2022, both the U.S. Attorney's office and the Department of Justice in Washington, D.C.[3] unquestionably possessed the evidence needed to bring the § 1959(a)(1) charges, which carried the death penalty as a possible punishment.

---

[2] **Exhibit A** is being filed under seal. The rest of the exhibits are not being filed under seal.

[3] It is also notable that a senior Main Justice prosecutor, David L. Jaffe, appeared on the original indictment along with the then-U.S. Attorney, Erek L. Barron. ECF No. 1, at 19.

On December 7, 2022, Mr. Constanza-Galdomez and Co-defendants Valenzuela-Rodriguez and Pesquera-Puerto made their initial appearances on the original indictment and agreed to be detained without bond (in order to avoid being taken into immigration custody because of their lack of lawful immigration status). ECF Nos. 11, 14, 16, 17, 20 & 21. All three men were undocumented immigrants at the time of the alleged offenses and continue to have such a lack of immigration status today.

Thereafter, during the next two years, lead counsel for the government – former Assistant U.S. Attorney Anatoly Smolkin – filed *eight* unopposed motions to exclude time during the pretrial period under the Speedy Trial Act. ECF Nos. 27, 31, 34, 46, 49, 51, 59 & 66. This Court granted each of those motions. ECF Nos. 28, 31, 35, 47, 50, 52, 60 & 67.

During that two-year period, several important events occurred. First, after notifying Mr. Constanza-Galdomez's counsel in an email on April 7, 2024, that the government would not be seeking the death penalty,[4] on April 22, 2024, AUSA Smolkin filed a letter with this Court stating that the Attorney General had directed the U.S. Attorney in the District of Maryland *not* to seek the death penalty. ECF No. 48. Second, on September 7, 2023, Codefendant Wualter Orellana-Hernandez made his initial appearance and was detained. ECF Nos. 36 & 37. On October 2, 2024, Orellana-Hernandez pleaded guilty pursuant to a plea agreement. ECF Nos. 62 & 63. And, third, on September 13, 2024, this Court entered an order scheduling an anticipated four-week jury trial on the original indictment for September 2, 2025, with proposed voir dire and jury instructions due by June 30, 2025. This Court has characterized that trial date as "fixed." ECF No. 61.

In each of the eight motions to exclude time under the Speedy Trial Act, the government stated that one of the reasons that exclusion of time under the Act furthered the "ends of justice"

---

[4] *See* **Exhibit** B (declaration of Julie Reamy).

was to permit plea negotiations between counsel for the government and counsel for the defendants. ECF Nos. 27 (at p. 3), 31 (at p. 3), 34 (at p. 3), 46 (at p. 3), 49 (at p. 3), 51 (at p. 3), 59 (at p. 3) & 66 (at p. 3). Such a representation was made in the four motions filed *after* the government formally gave notice that it was not seeking the death penalty against any of the defendants. For instance, in the government's motion filed on April 22, 2024, the government stated:

> . . . *[I]n March 2024, the Department of Justice directed this Office not to seek the death penalty against the Defendants in this case.* It was in the interest of justice to delay setting a schedule in this case while the determination as to the death penalty was ongoing. Despite the exercise of due diligence by the parties, *the United States and the Defendants require additional time* to complete discovery *and to engage in plea discussions.* Accordingly, the interests of justice served by the requested exclusion of time outweigh the interests of the public and the Defendant in a speedy trial.

ECF No. 49, at 3 (emphasis added); *see also* ECF No. 51, at 3 ("[T]he parties have commenced plea discussions to determine if they can reach a resolution without the need for a trial, and they require additional time for those discussions to continue. The parties anticipate requesting a scheduling order from the Court, but they intend to continue their plea discussions even after a schedule is set."); ECF No. 59, at 3 (same); ECF No. 66, at 3 (same).

The negotiations envisioned a potential plea offer from the government of less than a life prison sentence. As the attached declaration from defense counsel Julie Reamy shows, AUSA Smolkin proposed plea negotiations in December 2022. Over the next two years, with delays caused by the belated production of discovery, she and he engaged in negotiations about an offer of a specific number of years of imprisonment (or a range of years from which the court would choose a specific sentence), pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). They were still negotiating the precise number of years through early 2025 when the government changed its position on the death penalty. *See* **Exhibit B**.

**C. Events Following President Trump's January 20, 2025 Executive Order and Attorney General Bondi's February 5, 2025 Directive to Federal Prosecutors**

In the spring of 2025, this case took a dramatic turn when the government sought to renege on its prior formal representation that it would not seek the death penalty. The shift was not the result of any intervening change in the law or discovery of new evidence. Instead, it solely was the result of the change in administrations and corresponding *policy* changes.

On November 5, 2024, Donald Trump won the presidential election. He was sworn in on January 20, 2025. On January 20, 2025, he issued an executive order, "Restoring the Death Penalty and Protecting Public Safety."[5] Among other things, that executive order explicitly stated: "[T]he Attorney General shall, where consistent with applicable law, pursue Federal jurisdiction and seek the death penalty regardless of other factors for every federal capital crime involving . . . [a] capital crime committed by an alien illegally present in this country."[6]

On February 4, 2025, Pam Bondi was confirmed by the Senate to be U.S. Attorney General. On February 5, 2025, Attorney General Bondi issued a memorandum to attorneys in the Department of Justice, "Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions."[7] Among other things, that memorandum, fully consistent with President Trump's executive order, provides that: "Absent significant mitigating circumstances, federal prosecutors are expected to seek the death penalty in cases involving . . . capital crimes committed by aliens who are illegally present in the United States." *Id.; see also id.* ("The murder of a law-enforcement officer, or a capital crime by an alien illegally present in the United States, are the types of

---

[5] The executive order is available at: https://www.whitehouse.gov/presidential-actions/2025/01/restoring-the-death-penalty-and-protecting-public-safety/

[6] *Id.*

[7] That memorandum is available at: https://www.justice.gov/ag/media/1388561/dl?inline.

aggravating circumstances that, absent significant mitigating circumstances, will warrant the

Department seeking the death penalty.  *See* 18 U.S.C. §§ 3592(c)-(d).").

Her memorandum also stated:

The Attorney General's Capital Review Committee is directed to review no-seek decisions in all pending capital-eligible cases (i.e., death-eligible cases that have not yet resulted in a conviction) charged between January 20, 2021, and January 19, 2025. This group shall reevaluate no-seek decisions and whether additional capital charges are appropriate. Particular attention shall be paid to cases involving defendants associated with cartels or transnational criminal organizations**,** *capital crimes committed by defendants present in the United States illegally*, and capital crimes committed in Indian Country or within the federal special maritime and territorial jurisdictions. The review required by this paragraph shall be completed within 120 days.[8]

On February 21, 2025, AUSA Smolkin withdrew as lead counsel for the government and

was replaced by new prosecutors.  ECF Nos. 69-71, 83, 86.  On April 2, 2025, the government

filed a status report, which stated that, "the prosecution team was advised by a member of the

Department of Justice's Capital Case Section (CCS) that The Attorney General's Capital Review

Committee have selected defendants Wilson Costanza-Galdomez, Edis Valenzuela-Rodriguez,

and Jonathan Pesquera-Puerto for further evaluation." ECF No. 73; *see also*  ECF No. 75.

On April 4, 2025, this Court entered an order stating that:

[T]his Court will immediately begin the process of identifying learned counsel who are available for the September 2, 2025 trial date in this case.  As this Court expressed to the parties during the teleconference held on April 3, 2025, the process of obtaining three learned counsel with availability will not be quick.  Given the limited supply of learned counsel in Maryland and nationwide, and the demand for those counsel, it is highly unlikely that such counsel would be identified in time to adequately prepare for and attend a Committee meeting in the next two weeks.

ECF No. 76.

---

[8] *Id.* (emphasis added).

On April 11, 2025, defense counsel for Mr. Constanza-Galdomez and Codefendants Valenzuela-Rodriguez and Pesquera-Puerto sent a letter to DOJ attorneys opposing DOJ's decision to reconsider the prior decision not to seek the death penalty. **Exhibit C**. In it, Julie Reamy and counsel for the two codefendants, among other things, stated that:

> • "Since this indictment has never been for a capital crime, the assignment of learned counsel, which is mandatory under Section 3005, has never been made. As the court in *Boone* noted, learned counsel play a critical role in the [DOJ] authorization process for death penalty prosecutions, "including investigation into relevant factors" and "presenting mitigation factors counseling against imposition of death. [*United States v. Boone*, 245 F.3d 352, 360 (4th Cir. 2001).]"

> • "In addition to not having learned counsel, undersigned counsel have never retained mitigation specialists or sought to conduct a mitigation investigation, which is mandated by the 2003 ABA Guidelines and countless United States Supreme Court cases."

> • "Defense counsel relied on the fact that the instant case was not capitally eligible, and that the Government confirmed that it was not seeking the death penalty, over the course of this litigation. On the very same day the Government filed its Notice of Intent Not to Seek the Death Penalty, the Government filed a Consent Motion to Exclude Time From Speedy Trial Calculations. ECF 49. In this motion the Government requested to exclude time under the Speedy Trial Act for a period from March 1, 2024, to May 30, 2024. One of the reasons for this request was '[f]inally, in March 2024, the Department of Justice directed this Office not to seek the death penalty against the Defendants in this case. It was in the interest of justice to delay setting a schedule in this case while the determination as to the death penalty was ongoing.' ECF 49, page 3, attached. On September 13, 2024, by agreement, a motions schedule and a trial date of September 2, 2025, was chosen. ECF 61. A second Consent Motion to Exclude Time From Speedy Trial Calculations was filed on December 1, 2024, ECF 66, asking the Court to exclude time until the September 2, 2025 trial date was filed. These scheduling agreements and consent motions to exclude time were based on the Government's representations that they were not seeking the death penalty. If there had been any notion that the Government would reverse its decision, defense counsel never would have consented to the Government's motions to exclude time."

> • "This case has been non-capital since the return of the indictment almost three years ago, and this fact was reinforced by the Government in its notice not to seek the death penalty. It has been treated as such by all counsel, all the accused, the Government, and the Honorable Stephanie Gallagher. The Defense has relied on the indictment and the representations of the Government in its trial preparation,

pretrial motion litigation, investigation, expert assistance, plea negotiations, and client advice."

*Id.*

On April 23, 2025, defense counsel met with the DOJ's Capital Review Committee and urged it not to change the government's position. On May 8, 2025, two-and-a-half years after the original indictment, the grand jury returned a superseding indictment, adding two death-penalty-eligible charges – Counts Two and Three, which each charged Mr. Constanza-Galdomez and Codefendants Valenzuela-Rodriguez and Pesquera-Puerto with aiding and abetting each other in the murders of Victims 3 and 4 in the aid of racketeering activity, in violation of 18 U.S.C. §§ 1959(a)(1) & 2. ECF No. 90. Other than adding those two new charges and removing reference to former Codefendant Orellana-Hernandez, the superseding indictment added no new facts to the original indictment. Furthermore, new Counts Two and Three alleged facts already alleged in the original 2022 indictment (based on evidence known to the government since June 2020).

On May 12, 2025, this Court entered an order, stating:

> Should the government intend to attempt to contravene its representation of April 22, 2024 that it does not intend to seek the death penalty in this case, ECF 48,1 it must file the notice required by 18 U.S.C. § 3593(a) no later than Friday, May 16, 2025 at noon. The setting of this deadline does not suggest or imply that the Court believes any such change in position would be legally permissible or timely. The deadline is intended only to permit this issue to be litigated (potentially under an expedited briefing schedule) before *the fixed trial date of September 2, 2025*. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962); *United States v. Moussaoui*, 483 F.3d 220, 236 (4th Cir. 2007).

ECF No. 93 (emphasis added).

On May 16, 2025, with only 109 days left before the firmly scheduled jury trial, the government filed notices of intent to seek the death penalty against Mr. Constanza-Galdomez and Codefendants Valenzuela-Rodriguez and Pesquera-Puerto. ECF Nos. 94-96.

As of the date that this motion is being filed, there are five prosecutors working on the government's case.[9]  Mr. Constanza-Galdomez has two court-appointed counsel, although one (undersigned counsel) was only recently appointed on May 16, 2025.[10]  The two codefendants each have a single attorney.  Neither Mr. Constanza-Galdomez's two appointed attorneys nor the two codefendants' attorneys are "learned counsel" within the meaning of 18 U.S.C. § 3005.

### III.
### Legal Argument

For many independent reasons, this Court should strike the government's notice of intent to seek the death penalty against Mr. Constanza-Galdomez (ECF No. 94), with prejudice to refiling any additional such notice under 18 U.S.C. § 3593(a).

### A.  This Court Should Strike the Government's May 16, 2025 Notice as Untimely.

Assuming *arguendo* that § 3593(a) permits an outright reversal of the government's formally announced decision *not* to seek the death penalty (and also assuming that the government did not waive its ability to seek, and is not estopped from seeking, the death penalty) – issues discussed *infra* – this Court should strike the government's May 16, 2025 notice as untimely.

Section 3593(a) provides that:

If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, *a reasonable time before the trial or before acceptance by the court of a plea of guilty*, sign and file with the court, and serve on the defendant, a notice—

(1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is

---

[9] Assistant U.S. Attorneys Alex Kalim and Ken Clark, and DOJ Trial Attorneys Grace Bowen, Matt Hoff, and Brian Leaming.

[10] Undersigned counsel was not appointed as a "learned counsel."  Instead, he was appointed for the purpose of assisting in the litigation and potential interlocutory appeal of this Court's ruling on this motion to strike the government's May 16, 2025 notice.

> justified under this chapter and that the government will seek the sentence of death; and
>
> (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

18 U.S.C. § 3593(a) (emphasis added).

Section 3593(a) is "a prophylactic statute, one of the chief aims of which is to protect the accused from having to endure a trial for his life for which he was not on reasonable notice, [which requires] inquiry into the objective reasonableness of the time between issuance of the Death Notice and the trial itself, in light of the particulars of the charged offense and the anticipated nature of the defense." *United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003). Thus, a district court must conduct "a pretrial inquiry into the objective reasonableness of the [timeliness of the] notice provided." *Id*. at 731. A notice of intent to seek the death penalty that is filed in an "objectively unreasonable" manner with respect to the scheduled trial date must be stricken. *Id.*

The key holdings of the Fourth Circuit's decision in *Ferebe* concerning the timeliness requirement are as follows:

• Whether a defendant has been actually prejudiced as a result of an untimely notice of the government's intent to seek the death penalty is irrelevant. *Ferebe*, 332 F.2d at 732.

• "[E]valuation of the following factors, among others that may appear relevant, is necessary in order to assess the reasonable timeliness of a Death Notice: "(1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects*; and, in addition, (4) the status of discovery in the proceedings." *Id.* at 737 (internal footnote omitted).[11]

• The existing trial date – and not a potential future trial date, if a motion for continuance were to be granted – is the key date for purposes of the timeliness analysis. *Ferebe*, 332

---

[11] The four enumerated factors are a "non-exhaustive list of factors" for courts to consider, and no single factor is dispositive. *United States v. Breeden*, 366 F.3d 369, 374 (4th Cir. 2004).

F.3d at 739; *see also id.* at 737 n.60.  For that reason, the government's giving notice of its intent to seek the death penalty cannot serve as the basis for a continuance of the trial date. That is, an untimely notice cannot be rescued by delaying the existing trial date.[12]

Applying the four *Ferebe* timeliness factors in Mr. Constanza-Galdomez's case and considering other relevant facts and circumstances clearly demonstrates that the government's May 16, 2025 notice was untimely and, thus, must be stricken.

### 1. Nature of the Charges

This factor strongly favors Mr. Constanza-Galdomez in two ways.  First, the charges are complex.  All RICO cases are inherently complex, *see Jennings v. Emry*, 910 F.2d 1434, 1435-36 (7th Cir. 1990); and the addition of the two § 1959(a)(1) charges in the superseding indictment make this case even more complex.  Second, until May 8, 2025, Mr. Constanza-Galdomez was solely charged with a non-capital offense under 18 U.S.C. § 1962(d).  The death penalty was never legally at issue from the outset – when the defendants initially were arrested on related state charges in the summer of 2020[13]  and later when the initial federal charges were filed in November 2022 – and it appeared permanently off the table when the government filed its April 2024 notice that it would not seek the death penalty.

In *United States v. Spurlock*, No. 3:23-cr-00022, ___ F. Supp.3d___, 2025 WL 1360499 (D. Nev. May 9, 2025), in which the district court struck a similar notice of intent to seek the death penalty when the government previously had filed a notice that it did not intend to seek the death penalty, the government had initially filed charges that at least carried the death penalty as a

---

[12] *See also United States v. Hatten*, 276 F. Supp.2d 574, 579 (S.D. W.Va. 2003) ("[T]he Court must look at the trial date that was in existence at the time of [the] filing, even though the issuance of the Death Notice may affect the viability of the trial date."); *United States v. Ponder*, 347 F. Supp. 2d 256, 267 (E.D. Va. 2004) ("[I]f a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is *per se* unreasonable.").

[13] Maryland does not have the death penalty as a possible punishment under state law.

possible punishment. *See Spurlock*, 2025 WL 1360499 at *2. Therefore, Mr. Constanza-Galdomez's motion to strike is even more compelling than Spurlock's motion because, unlike Spurlock, Mr. Constanza-Galdomez was not initially charged with a capital offense. He thus did not already have a learned counsel, as Spurlock did. *Id.* at *2. In the present case, the government waited nearly five years following Mr. Constanza-Galdomez's arrest to bring federal capital charges – including 13 months after formally announcing that it would not seek the death penalty.

### 2. Nature of the Aggravating Factors

This factor also favors Mr. Constanza-Galdomez. Until the government's May 16, 2025 notice, no aggravating factors had been raised as something against which Mr. Constanza-Galdomez and his counsel should be prepared to defend at the September 2, 2025 trial. The May 16, 2025 notice includes "victim impact"[14] factors – both about Victims 3 and 4 and their "family and friends" – and the "heinous, cruel, or depraved" aggravating factor. ECF No. 94, at 2-5. To properly investigate and defend against such factors, Mr. Constanza-Galdomez's counsel would be required to devote substantial time and resources – in addition to spending an inordinate amount of time developing mitigating evidence (as discussed *infra*).

### 3. Time Remaining Before Trial

At the time that the government filed its May 16, 2025 notice, there were only 109 days remaining before the September 2, 2025 trial date – which, since September 2024, had been a fixed trial date and was made at the request of the government. ECF No. 59, at 3; ECF No. 61. The

---

[14] *See Payne v. Tennessee*, 501 U.S. 808 (1991).

question thus is whether 109 days is sufficient to permit for an adequate defense at a capital murder trial. *Of course, it is not* – for several related reasons.[15]

First, there was not even any *informal* notice of the government's likely intent to seek the death penalty during the entire time from December 7, 2022 (when Julie Reamy was appointed as Mr. Constanza-Galdomez's counsel) until the government's status report filed on April 2, 2025. Indeed, the government did not file any death-penalty-eligible charges until over a month later, on May 8, 2025, and did not give formal notice that it was seeking capital punishment until May 16, 2025. Yet, as discussed in Part II.B., *supra*, the government had a basis to file federal death-penalty-eligible charges in 2020 and unquestionably could have done so in November 2022 when the original federal indictment was filed. Moreover, it is not as if the government developed any new evidence that justified its 180-degree change in position on the death penalty in May 2025.

During the 30-month period between Ms. Reamy's December 2022 appointment and the government's May 16, 2025 notice, understandably no preparation whatsoever for a potential death penalty trial was done. And, to this date, there has been no appointment of a learned counsel, a mitigation specialist, or specialized mental health experts (e.g., a psychiatrist, psychologist, and neurologist with experience in capital cases), who can assess Mr. Constanza-Galdomez both for

---

[15] Because it takes so long for the defense (and the court) to prepare for a death penalty trial, the DOJ typically files a notice that it is seeking the death penalty long before a trial is scheduled to occur. In *Ferebe*, 332 F.3d at 725, the Fourth Circuit noted that "Ferebe presents some evidence, and the prosecution does not challenge it, that, nation-wide, federal prosecutors file Death Notices, upon authorization by the Attorney General, with an average of 8.4 months remaining before trial." 332 F.3d at 725. The average time between death penalty notices and scheduled trial dates has grown significantly since *Ferebe* was decided. During the past two decades or so, the average time between the authorization of a capital prosecution by the Attorney General and the start of a capital trial has been *28 months*. **Appendix D** (declaration of Matthew Rubenstein, Director of the Capital Resource Counsel (CRC), which is funded and administered by the Administrative Office of the U.S. Courts). Also noteworthy is that in such cases, the prosecution typically had already filed death-penalty-eligible charges and "learned counsel" already was appointed for the defendant at the time the DOJ issued a formal notice of its intent to seek the death penalty. Thus, in those cases, unlike in the present case, the defense already has had a meaningful opportunity to start developing capital mitigation before the formal notice of the government's intent to seek the death penalty.

an intellectual disability[16] and for mental health mitigation. All are essential for an effective defense in a death penalty case. *See* 18 U.S.C. § 3005 ("learned counsel" requirement); GUIDE TO JUDICIARY POLICY, Vol. 7A, DEFENDER SERVICES, PART A, GUIDELINES FOR ADMINISTERING THE CJA AND RELATED STATUTES, *Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*, § 620.60.10 ("Appointment of Counsel Before Judgment");[17] *id.* at 91 (Appx. 6A, "Commentary") ("[T]he first responsibility of the court in a federal death penalty case is to appoint experienced, well-trained, and dedicated defense counsel who will provide high quality legal representation."); American Bar Association (ABA), GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES ("ABA's *Guidelines*") 4.1.1 ("Defense Team and Supporting Services"), *reprinted in* 31 HOFSTRA L. REV. 913, 952 (2003) ("The defense team should consist of no fewer than two attorneys [qualified to handle capital cases], an investigator, and a mitigation specialist."); *id.* (Commentary), *reprinted in* 31 HOFSTRA L. REV. at 1061 ("Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all-purpose' expert who may have insufficient knowledge or experience to testify persuasively [in a capital case].").

Both the Fourth Circuit and Supreme Court have looked to the ABA's *Guidelines* in determining whether a capital defense attorney provided ineffective assistance of counsel. *See, e.g.*, *Williams v. Stirling*, 914 F.3d 302, 313 (4th Cir. 2019) (citing ABA's *Guidelines* and *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). In addition, the Judicial Conference of the United States Courts has recommended that: "All attorneys appointed in federal capital cases should comply with the American Bar Association's 2003 *Guidelines for the Appointment and*

---

[16] *See Atkins v. Virginia*, 536 U.S. 304 (2002) (Eighth Amendment prohibits a death sentence imposed on an intellectually disabled defendant).

[17] Available at: https://www.uscourts.gov/sites/default/files/2025-01/guide-vol07a-ch06.pdf

*Performance of Defense Counsel in Death Penalty Cases* (Guidelines 1.1 and 10.2 et seq.) and the *2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*." GUIDE TO JUDICIARY POLICY, Vol. 7A, Appx. 2A: *Model Plan for Implementation and Administration of the Criminal Justice Act*, XIV.B.10, at 26-27.[18]   Therefore, this Court should consider the ABA's *Guidelines* in determining whether the government's May 16, 2025 notice of intent to seek the death penalty was filed in a reasonably timely manner based on the facts and circumstances of this case.

The need for two counsel (including at least one learned counsel), a mitigation specialist, and appropriate expert witnesses reflects the fundamental Eighth Amendment requirement in capital cases that all relevant mitigating evidence must be admitted and considered by a capital sentencing jury.  *See, e.g.*, *Skipper v. South Carolina*, 476 U.S. 1 (1986).  Similarly, the Supreme Court repeatedly has concluded that capital defense counsel provided ineffective assistance of counsel when they failed to develop or offer relevant mitigating evidence during the capital sentencing phase.  *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510 (2003).  Likewise, the Supreme Court has envisioned capital defense counsel having a meaningful opportunity to defend against aggravating evidence offered by the prosecution.  *See, e.g.*, *Barefoot v. Estelle*, 463 U.S. 880, 901 (1983) (assuming that "the adversary process can[] be trusted to sort out the reliable from the unreliable evidence" about an aggravating factor, with the capital defendant having "the opportunity to present his own side of the case" in aggravation).  Just like developing mitigating evidence takes substantial time, so does preparing for a defense against the prosecution's aggravating evidence. *See Le*, 316 F. Supp.2d at 353.

---

[18] Available at: https://www.uscourts.gov/sites/default/files/2025-01/guide-vol07a-2.pdf

In the present case, the defense's complete absence of preparation for a death penalty trial has occurred because the government (1) did not initially bring death-penalty-eligible charges in mid-2020 or thereafter in the original 2022 indictment; (2) affirmatively notified the court and defense that the government would *not* seek the death penalty in April 2024; and (3) waited 13 more months until bringing a superseding indictment with death-penalty-eligible charges and then – just 109 days before the schedule jury trial – filing a notice that the government changed its position and is now seeking the death penalty after all.

This significant period of time in which no preparation for a capital trial has occurred – including without the required qualified learned counsel, a mitigation specialist, and experts – means that the defense now must *start entirely from scratch* in preparing for a capital trial commencing on September 2, 2025. *Cf. Spurlock*, 2025 WL 1360499, at *26 ("The mere existence of the no-seek notice also distinguishes this case from [a prior case in which the government amended a notice that it was seeking the death penalty], where 'from the start, all parties knew [it] was a likely death penalty case,' and the defense had begun to prepare a death defense months before the notice was filed, including by hiring mitigation experts and engaging in discussions about death-qualifying a jury.") (citation and internal quotation marks omitted).

Even assuming that Mr. Constanza-Galdomez currently was represented by learned counsel and had the assistance of a mitigation specialist and experts, the remaining time for preparation for a death penalty trial would be grossly inadequate in view of the "highly specialized and demanding litigation"[19] involved in a death penalty case. As the ABA's *Guidelines* recognize:

---

[19] GUIDE TO JUDICIARY POLICY, Vol. 7, DEFENDER SERVICES, PART A, GUIDELINES FOR ADMINISTERING THE CJA AND RELATED STATUTES, *Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*, § 620.30(b)(1) ("Procedures for Appointment of Counsel in Federal Death Penalty Cases").

In order to achieve the goal of providing capital defendants with high quality legal representation, the caseloads of their attorneys must be such as to permit the investment of the *extraordinary time and effort necessary to ensure effective and zealous representation in a capital case*. . . .  Studies have consistently found that *defending capital cases requires vastly more time and effort by counsel than noncapital matters*. . . . In terms of actual numbers of hours invested in the defense of capital cases, recent studies indicate that several thousand hours are typically required to provide appropriate representation. For example, an in-depth examination of federal capital trials from 1990 to 1997 conducted on behalf of the Judicial Conference of the United States found that the total attorney hours per representation in capital cases that actually proceeded to trial averaged 1,889.

ABA GUIDELINES, Commentary to Guideline 6.1 ("Workload"), *reprinted in* 31 HOFSTRA L. REV. at 967-68 (footnotes omitted; emphasis added); *see also* ABA Guideline 1.1 (Commentary to "Introduction"), *reprinted in* 31 HOFSTRA L. REV. at 925-26.

With respect to the capital sentencing phase, the *Guidelines* provide that *extensive* mitigation development must be done:

Because the sentencer in a capital case must consider in mitigation, "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant," "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."  At least in the case of the client, this begins with the moment of conception.

ABA Guideline 10.7 ("Investigation") (Commentary), *reprinted in* 31 HOFSTRA L. REV. at 1022. The ABA's 2008 *Supplemental Guidelines* in detail set forth the inordinate amount of work required to prepare for a capital sentencing phase.[20]

---

[20] The *Supplemental Guidelines* provide, in particular, that:

The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death. The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual

orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

. . . Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

. . . Team members must provide counsel with documentary evidence of the investigation through the use of such methods as genealogies, social history reports, chronologies and reports on relevant subjects including, but not limited to, cultural, socioeconomic, environmental, racial, and religious issues in the client's life. The manner in which information is provided to counsel is determined on a case by case basis, in consultation with counsel, considering jurisdictional practices, discovery rules and policies.

. . . It is the duty of the defense team members to aid counsel in the selection and preparation of witnesses who will testify, including but not limited to:

    1. Expert witnesses, or witnesses with specialized training or experience in a particular subject matter. Such experts include, but are not limited to:
        a. Medical doctors, psychologists, toxicologists, pharmacologists, social workers and persons with specialized knowledge of medical conditions, mental illnesses and impairments; substance abuse, physical, emotional and sexual maltreatment, trauma and the effects of such factors on the client's development and functioning.
        b. Anthropologists, sociologists and persons with expertise in a particular race, culture, ethnicity, religion.
        c. Persons with specialized knowledge of specific communities or expertise in the effect of environments and neighborhoods upon their inhabitants.
        d. Persons with specialized knowledge of institutional life, either generally or within a specific institution.

    2. Lay witnesses, or witnesses who are familiar with the defendant or his family, including but not limited to:
        a. The client's family, extending at least three generations back, and those familiar with the client;
        b. The client's friends, teachers, classmates, co-workers, employers, and those who served in the military with the client, as well as others who are familiar with the client's early and current development and functioning, medical history, environmental history, mental health history, educational history, employment and training history, military experience and religious, racial, and cultural experiences and influences upon the client or the client's family;
        c. Social service and treatment providers to the client and the client's family members, including doctors, nurses, other medical staff, social workers, and housing or welfare officials;
        d. Witnesses familiar with the client's prior juvenile and criminal justice and correctional experiences;
        e. Former and current neighbors of the client and the client's family, community members, and others familiar with the neighborhoods in which the client lived, including the type of housing, the economic status of the community, the availability of employment and the prevalence of violence;
        f. Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;

Of course, no such work in Mr. Constanza-Galdomez's case has even begun. And, even if his current counsel had been able to begin that process on May 16, 2025 – instead of being forced to spend many dozens of hours preparing this motion to strike the government's May 16, 2025 notice – it would take vastly more time than a mere 109 days to complete that work. Indeed, merely concerning the threshold requirement of appointment of learned counsel, this Court has recognized: "[T]he process of obtaining three learned counsel with availability will not be quick" in view of "the limited supply of learned counsel in Maryland and nationwide. . . ." ECF No. 76.

In a typical death penalty case, it takes learned counsel and a mitigation specialist *at least* year, and often more, to effectively investigate and develop mitigation. *See* **Exhibits E, F, & G**.[21] Ruhnke's declaration opines that it would be "professionally irresponsible" to accept an appointment in a death penalty case when no capital mitigation work has been done before the

---

g. Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.

. . . It is the duty of team members to gather documentation to support the testimony of expert and lay witnesses, including, but not limited to, school, medical, employment, military, and social service records, in order to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state, intellectual capacity, and life history that may explain or diminish the client's culpability for his conduct, demonstrate the absence of aggressive patterns in the client's behavior, show the client's capacity for empathy, depict the client's remorse, illustrate the client's desire to function in the world, give a favorable opinion as to the client's capacity for rehabilitation or adaptation to prison, explain possible treatment programs, rebut or explain evidence presented by the prosecutor, or otherwise support a sentence less than death.

. . . It is the duty of the team members to aid counsel in preparing and gathering demonstrative evidence, such as photographs, videotapes and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts and letters of praise or reference.

ABA, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, *reprinted in* 36 HOFSTRA L. REV. 677, 689-92 (2008).

[21] Declarations from (1) **David A. Ruhnke**, a veteran "learned counsel" in death penalty cases; (2) **Susan Garvey**, a veteran mitigation specialist and attorney, who currently serves as National Mitigation Coordinator for the National Habeas Assistance and Training Project; and (3) **Russell Stetler**, also a veteran mitigation specialist, who retired as the director of the National Mitigation Coordinator for Federal Death Penalty Projects. Those projects are funded by the Administrative Office of the U.S. Courts.

appointment and the trial is scheduled to commence in a mere 109 days. **Exhibit E ¶** 7; *see also* ABA, MODEL RULE OF PROFESSIONAL RESPONSIBILITY 1.1 ("Competence") ("Competent representation requires the legal knowledge, skill, *thoroughness and preparation reasonably necessary for the representation*.") (emphasis added); *id.*, Commentary ("Competent handling of a particular matter . . . includes adequate preparation. . . . [M]ajor litigation . . . ordinarily require more extensive treatment than matters of lesser complexity and consequence.").

The three declarations further explain that, when a capital defendant is a noncitizen and spent his formative years in a foreign country – as Mr. Constanza-Galdomez did, in El Salvador – there is even more time-consuming mitigation work required, including foreign travel. **Exhibit E**, at ¶ 9; **Exhibit F**, at ¶ 55; **Exhibit G**, at ¶¶ 35-36. *See generally* Scharlette Holdman & Christoper Seeds, *Cultural Competency in Capital Mitigation*, 36 HOFSTRA L REV. 883, 920 (2008); *see also State v. Gutierrez*, 136 Nev. 881, 477 P.3d 342 (Nev. 2020) (ruling that a capital defense attorney provided ineffective assistance by failing to travel to Mexico in order to develop mitigating evidence for his capital client, who grew up in Mexico).

Furthermore, by abruptly seeking to transform the long-scheduled trial from a non-capital trial to a death penalty trial, the government also has forced the defense to reassess its past approach to preparing for the guilt-innocence phase. As the ABA's *Guidelines* explain:

> Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case. In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated. The client is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt. At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced. Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages. Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument.

ABA Guideline 10.10.1 ("Trial Preparation Overall") (Commentary), *reprinted in* 31 HOFSTRA L. REV. at 1047-48.

 For all these reasons, the 109-day period from May 16, 2025, to September 2, 2025, clearly is not an "objectively reasonable" time period in which Mr. Constanza-Galdomez and his counsel can adequately prepare for a death penalty trial. Significantly, Judge Ellis found that a 94-day period between the government's amendment to its prior notice of its intent to seek the death penalty was not an "objectively reasonable" period of time. *United States v. Le*, 316 F. Supp.2d 343 (E.D. Va. 2004). In that case, the government's *original* notice of its intent to seek the death penalty was found timely by the court. However, the court found the government's subsequent *amended* notice – which added new aggravating factors – to be untimely because it was filed with just 94 days before the trial date. *Id.* at 346-55.[22] If 94 days is an objectively unreasonable time period in which to defend against newly added aggravating factors (when the defense, including a learned counsel, previously was notified that the prosecution was seeking the death penalty and other aggravating factors were contained in the original notice), then 109 days unquestionably is not a reasonable time in which *to start entirely from scratch* in defending against the death penalty. This is particularly true when learned counsel, a mitigation specialist, and expert witnesses for

---

[22] In *Ferebe*, the government originally had announced its intent to seek the death penalty on one of two capital charges pending against Ferebe *over three years before* the scheduled trial date. *Ferebe*, 332 F.3d at 725-26. Because Ferebe's defense counsel for over three years knew that the prosecution was seeking the death penalty for one of the two capital charges, the government pointed out that "[d]efense counsel also . . . had ample time to develop mitigating evidence . . . ." Brief of Appellee, No. 01-022, 2002 WL 32726915, at *11 (filed Mar. 29, 2002). That argument, however, did not carry the day on remand from the Fourth Circuit primarily because the district court concluded that 39 days between the amended notice and the trial date "was not enough time for Ferebe to have prepared his death defense" in view of two new aggravating factors – victim impact and future dangerousness – included in the government's amended death penalty notice. *See United States v. Ferebe*, No. 97-0329, 2005 WL 1429261, at *8 (D. Md. June 16, 2005). Of course, in the present case, unlike *Ferebe*, the defense has not had any time to develop capital mitigation.

capital mitigation have yet to be appointed and current counsel are being forced to spend several of those 109 days litigating this motion to strike the government's May 16, 2025 notice.

Finally, it is worth noting another-time consuming task required before a death penalty trial can occur: preparing questionnaires for prospective jurors, sending them to prospective jurors, and then analyzing them before individual *voir dire.* That process – which typically takes six to eight weeks – obviously has not yet begun and would consume even more of defense counsel's (and this Court's) time. *See Ferebe*, 2005 WL 1429261, at *7 (considering the lack of time to complete capital juror questionnaires to be a factor making the government's notice of its intent to seek the death penalty untimely).

### 4. Status of Discovery

Although the government appears to have provided the majority and perhaps all of the discovery related to the *guilt-innocence phase*, no additional discovery related to the *capital sentencing phase* has been provided – including any discovery related to the "victim impact" evidence referenced in the May 16, 2025 notice for both Victims 3 and 4. ECF No. 94, at 2-3, 4-5. That fact also militates in favor of striking the notice. *See Ferebe*, 2005 WL 1429261, at *7. In addition, if there will be a death penalty trial, Mr. Constanza-Galdomez's counsel – including a newly-appointed learned counsel – must again review the discovery related to the guilt-innocence phase to determine its relevance through the lens of capital defense counsel (which differs from the lens of a noncapital counsel). *See* ABA Guideline 10.10.1 ("Trial Preparation Overall") (Commentary), *reprinted in* 31 HOFSTRA L. REV. at 1047-48.

For these reasons, this Court should strike the government's May 16, 2025 notice.

### B. Assuming this Court Treats the Government's May 16, 2025 Notice as an *Amended* § 3593(a) Notice, this Court Should Strike It Because "Good Cause" Does Not Exist.

Assuming that the government's notice of its intent to seek the death penalty effectively serves as an amendment to its April 2024 notice – rather than the first notice under § 3593(a) – this Court, for two separate reasons, should not permit an amendment. First, the amendment is untimely; and, second, the government has not exercised reasonable diligence.

Section 3593(a) states that a court "may permit the attorney for the government to amend the [death] notice upon a showing of *good cause*." 18 U.S.C. § 3593(a) (emphasis added). The "good cause" standard requires the government to make two separate showings: (1) the amount of time between the amended notice and the scheduled jury trial is "an objectively reasonable amount of time for a defendant to prepare for the capital sentencing;" *and* (2) the government exercised "reasonable diligence" in amending its prior § 3593(a) notice. *United States v. Le*, 326 F. Supp.2d 739, 741-43 (E.D. Va. 2004).

### 1. The Government's Amended Notice Was Untimely.

The timeliness of an amended notice – in relation to the existing trial date – is equally relevant to § 3593(a)'s "good cause" as it is to § 3593(a)'s requirement that the original notice to seek the death penalty must be filed a "reasonable time before the trial." *Le*, 326 F. Supp.2d at 740-42. The question is "whether the amount of time remaining before the scheduled trial date is an objectively reasonable amount of time for a defendant [and his counsel] to prepare for the capital sentencing phase of trial . . . ." *Id.* at 741-42. As discussed *supra*, the government's May 16, 2025 notice was clearly untimely. Thus, whether this Court treats it as the original § 3593(a) notice or an amended notice, it should be stricken.

### 2. The Government Did Not Act with Reasonable Diligence in Filing the May 16, 2025 Notice.

Alternatively, even if the government's May 16, 2025 notice were timely, good cause does not exist for the government's attempt to amend its prior notice of its intent *not* to seek the death penalty because it failed to act with reasonable diligence. "[I]t is clear that § 3593(a)['s] good cause [standard] must focus on the diligence of the government in uncovering the new information contained in the Amended Death Notice and the timing of when that information was obtained." *Le*, 326 F. Supp.2d at 348-49; *see also id.* at 349 ("Here, as in other legal contexts, absent reasonable diligence, there can be no good cause. . . . [T]he burden is on the government to show reasonable diligence and hence good cause for amending the Death Notice.").

The government has had "reliable information"[23] about the relevant facts supporting a potential death penalty prosecution since the summer of 2020. **Exhibit A** (filed under seal). Yet it chose not to bring any federal charges until November 2022, when it filed non-capital charges, and it did not bring death-penalty-eligible charges and give notice of intent to seek the death penalty until May 2025.[24] The only thing that has changed since November 2022 and April 2024 is a change in death penalty *policy* by the executive branch – which is not "good cause." The *facts* and *law* have not changed. Moreover, even though current counsel for the government was aware of the new death penalty policy of the Department of Justice set forth in Attorney General Bondi's February 5, 2025 memorandum, the government never moved for a continuance of the September 2, 2025 trial date – likely because they realized it was a firm trial date that the government itself had requested.

---

[23] *Le*, 326 F. Supp.2d at 347-48.

[24] Because the State of Maryland does not have the death penalty as an option for any type of murder, the federal government cannot excuse its tardiness on the ground that it was giving the State the opportunity to pursue the death penalty.

Under all the relevant circumstances, the government did not act diligently in seeking to amend its April 2024 § 3593(a) notice in view of the September 2, 2025 trial date. *Spurlock* is instructive. The court held, in finding a lack of good cause, that "[t]he essential facts supporting the current charges and aggravators have been known to the government since the original indictment. . . ." *Spurlock*, 2025 WL 1360499, at *22. For the same reason, the government lacked reasonable diligence in filing its May 16, 2025 notice. Therefore, "good cause" does not exist to permit the government to amend its April 2024 notice, assuming this Court treats the May 16, 2025 notice as an amended § 3593(a) notice rather than as the original one notice.

### 3. Mr. Constanza-Galdomez Would Be Presumptively and Actually Prejudiced if the Notice Is Not Stricken.

In *Ferebe*, the majority of the Fourth Circuit – rejecting a dissenting judge's argument – held an analysis of whether the government's notice under § 3593(a) was properly filed should not consider if the notice caused "prejudice" to the defendant. *See Ferebe*, 332 F.3d at 732. Although *Ferebe* does not require a showing of prejudice, Mr. Constanza-Galdomez nevertheless can show prejudice at this juncture.[25]

As an initial matter, Mr. Constanza-Galdomez did not have the assistance of a learned counsel, mitigation specialist, and experts when his current lead counsel, Julie Reamy, made her presentation to DOJ's Capital Review Committee a few weeks ago. That itself constitutes substantial prejudice. *Cf. United States v. Dangleben*, No. 3:23-cr-0072, 2025 WL 1423842, at *5 (D. Virgin Islands May 16, 2025) ("Because Defendant has been proceeding according to [DOJ's

---

[25] Because no capital mitigation work has been conducted, Mr. Constanza-Galdomez necessarily cannot (yet) prove with specificity the exact prejudice that he has suffered as the result of the lost opportunity to develop mitigation caused by the passage of time. In the event that an appellate court were to require a showing of actual prejudice, Mr. Constanza-Galdomez reserves the right – after the appointment of learned counsel, a mitigation specialist, and experts – to prove such specific, actual prejudice that he has suffered by the government's belated notice of intent to seek the death penalty after disclaiming that intent in April 2024.

prior] 'no-seek' decision, he has been without the benefit of learned counsel for over a year and, thus, his trial preparation, as well as preparation for any re-review by the Capital Review Committee, is not what it would have been had a 'no-seek' notice not been filed. . . . [*T*]*he prejudice to Defendant cannot be overstated.*") (emphasis added).

Moreover, the government's delay in bringing capital charges and its deliberate decision to renege on its prior formal notice that it was not seeking the death penalty has presumptively prejudiced Mr. Constanza-Galdomez. *Cf. Doggett v. United States*, 505 U.S. 647, 656-57 (1992). *Doggett* involved a constitutional speedy trial analysis in a case involving six years of unnecessary pretrial delay caused by the government's negligence in arresting the defendant after his indictment. The Court presumed that the delay prejudiced the defendant:

> Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial [in a timely manner] occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him. . . . [S]uch is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, . . . and its consequent threat to the fairness of the accused's trial. . . . When the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review [i.e., six years], . . . and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, . . . nor persuasively rebutted, the defendant is entitled to relief.

*Id.* at 656-58 (citations and internal quotation marks omitted).

Although the Sixth Amendment's speedy trial clause does not apply to the sentencing phase, *Betterman v. Montana*, 578 U.S. 437, 439 (2016), and Mr. Constanza-Galdomez is not making a statutory or constitutional speedy trial claim at this juncture concerning the guilt-

innocence phase,[26] the *Doggett* Court's reasons for presuming prejudice due to the undue delay in that case support presuming prejudice based on the government's delay in announcing its intent to seek the death penalty in the instant case (particularly coupled with its April 2024 notice that it was *not* seeking the death penalty). Indeed, such a presumption applies even more forcefully here because the government's actions have not merely been negligent, as they were in *Doggett*. Instead, they have been *deliberate*.

Any counterargument that the current leadership of the Department of Justice cannot be responsible for the actions of the former administration's departmental leadership would contradict the Supreme Court's well-established rule that all prosecutors in the same office are vicariously responsible for each other's knowledge and prior representations. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government. *See* RESTATEMENT (SECOND) OF AGENCY § 272."); *cf. Santobello v. New York*, 404 U.S. 257, 262 (1971) (attributing one prosecutor's plea-bargain promise to a second prosecutor in the same office who had been unaware of the first prosecutor's promise when the second prosecutor breached the agreement at the defendant's sentencing); *United States v. Carter*, 454 F.2d 426, 427-28 (4th Cir. 1972) (en banc) (holding that a promise made by a federal prosecutor in one judicial district on which a defendant relied is enforceable against a federal prosecutor in a different district). Although DOJ may change its charging and sentencing policies in a new administration, it may not do so in a specific pending litigation when a prior formal representation was made and its reversal would prejudice the opposing litigant. *Cf. United States v. Mendoza*,

---

[26] Mr. Constanza-Galdomez reserves his right to file such a speedy trial motion in the future if the government is permitted to seek the death penalty.

464 U.S. 154, 161-62 (1984) (holding that nonmutual offensive collateral estoppel does not apply to federal government).

In addition to the prejudice inherent in his inability to have developed capital mitigation over the past few years, Mr. Constanza-Galdomez has been prejudiced in at least two other, independent ways by the government's conduct.  First, he relied to his detriment in consenting to the government's four motions to exclude time under the Speedy Trial Act after the government filed its formal April 2024 notice stating that it would not seek the death penalty.  ECF Nos. 49, 51, 59, & 66.  If he had known that the government later would renege on its April 2024 notice after the presidential election, he would have had a strong incentive not to delay resolution of the then-noncapital charges – by either entering into a plea agreement or insisting on a speedy trial on the non-capital charges (where the maximum penalty he would have faced would have been life imprisonment).

Significantly, the government's *four* motions to exclude time under the Speedy Trial Act filed after the government announced it was not seeking the death penalty were explicitly premised on the parties' joint desire to engage in plea negotiations about the then-pending non-capital charges.  If Mr. Constanza-Galdomez and his counsel had reason to believe in April 2024 that the Department of Justice after the 2024 presidential election would retract its formal notice that it would *not* seek the death penalty, they surely would not have agreed to those motions and the delays entailed thereby. As demonstrated by the attached declaration of Julie Reamy (**Exhibit B**), she and AUSA Smolkin engaged in extensive plea negotiations from late 2022 through early 2025.

Their negotiations, while they did not result in a formal plea offer from the government, clearly were moving in the direction of such an offer before the presidential election.[27]

Moreover, if Mr. Constanza-Galdomez had reason to believe that the Department of Justice after the 2024 presidential election would renege on its April 2024 formal representation that it would not seek the death penalty, he would have been strongly incentivized to enter into a plea bargain with the government before the election (and, if necessary, even could have pleaded guilty to the indictment without a plea agreement, thus precluding the government's ability to seek the death penalty under 18 U.S.C. § 3593(a) and the Double Jeopardy Clause). *See Hynes v. Tomei*, 237 A.D.2d 52, 55 n.1 (N.Y. App. Div. 1997) (discussing a defendant's differing incentives to plea bargain in a case with a capital charge depending on whether the prosecution is seeking the death penalty), *rev'd on other grounds*, 706 N.E.2d 1201 (N.Y. 1998). And his counsel certainly would have done everything in her power to end the case with a plea bargain if she had known in April 2024 what later would happen in early 2025. **Exhibit B**.

**Second**, Mr. Constanza-Galdomez has been subject to unjustified, inhumane treatment by the government's seeking to renege on its formal announcement in April 2024 that it would not seek the death penalty. Other courts have recognized the psychological harm inflicted on a defendant resulting from the prosecution's mere delay in deciding whether to seek the death penalty (when it ultimately decides not to do so).[28] The psychological harm inflicted by the

---

[27] As noted *supra*, the government entered into a plea bargain in 2024 with Codefendant Wualter Orellana-Hernandez.

[28] *See, e.g.*, *United States v. Green*, No. 12-CR-83S, 2018 WL 786185, at *11 (S.D.N.Y. 2018) (in dismissing an indictment on speedy trial grounds, the court noted among other factors the "unique anxiety and concern that comes with the looming prospect of the death-penalty, a prejudice not easily measurable and one absent in the majority of criminal cases."), *aff'd sub nom.*, *United States v. Black*, 918 F.3d 243, 265 (2d Cir. 2019) ("Black, Green, and Rodriguez were forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great, and this consideration weighs heavily in our determination that the delay here prejudiced Defendants-Appellees.").

government here inflicts an even more inhumane type of psychological trauma. As discussed *infra* in Part III.G., such wanton inhumane conduct by the government violates the Eighth Amendment and should preclude the death penalty.

### C. Section 3593(a) Does Not Authorize a Reversal of Prior Decision by DOJ Not to Seek the Death Penalty.

This Court can avoid the above analyses in Part III.A. & III.B by striking the government's notice to seek the death penalty on the ground that 18 U.S.C. § 3593(a) simply does not permit the government to reverse its prior formal decision *not* to seek the death penalty. *See Spurlock*, 2025 WL 1360499, at *21 ("[T]he Court agrees with Defendant that the FDPA must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so.").

The statute does not explicitly require formal notice of the government's decision *not* to seek the death penalty against a particular defendant whose charged conduct could support capital charges. Yet clearly the Department of Justice, as reflected in its *Justice Manual*,[29] believes such

---

[29] The *Justice Manual* provides that:

**9-10.030 - Purposes of the Capital Case Review Process**

The review of cases under this Chapter culminates in a decision to seek, **or not to seek**, the death penalty against an individual defendant. Each such decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws. . . .

**9-10.040 - Consultation With the Capital Case Section**

Prior to seeking an indictment for an offense potentially punishable by death, the United States Attorney or Assistant Attorney General shall consult with the Capital Case Section. . . .

\*\*\*

**9-10.150 - Post-Decision Actions**

In any case in which the Attorney General has directed the filing of a notice of intention to seek the death penalty, the United States Attorney or Assistant Attorney General shall not file or amend the notice until the Capital Case Section has approved the notice or the proposed amendment. The notice of intention to seek the death penalty shall be filed as soon as possible after transmission of the Attorney General's decision to seek the death penalty.

notice is required by the spirit of § 3593(a) – in particular, in order to relieve district courts of their obligation to comply with the special requirements for appointed counsel in capital cases, as required by 18 U.S.C. § 3005, including the appointment of "learned counsel."

The statute's notice requirement is essential to the fair administration of the federal death penalty because of the interplay between 18 U.S.C. §§ 3005, 3593, and 3599.[30]  The potential for a death sentence creates multiple time-consuming and costly obligations on the part of the federal court system to administer – including locating learned counsel willing to be appointed, appointing a mitigation specialist and various types of specialized experts for capital cases, and creating budgets for travel (including international travel for learned counsel and a mitigation specialist in the case of a foreign defendant like Mr. Constanza-Galdomez).  If a formal notice that the government is *not* seeking the death penalty can be withdrawn for any reason or no reason at all, then the federal judiciary loses its ability to fairly and efficiently administer the various statutory obligations and additional obligations created by the Judicial Conference of the U.S. Courts.  *See* GUIDE TO JUDICIARY POLICY (Vol 7., *Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*).[31]

---

The United States Attorney or Assistant Attorney General should promptly inform the district court and counsel for the defendant once the Attorney General has made the final decision [one way or the other].  Expeditious communication is necessary ***so that the court is aware, in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General not to seek the death penalty***, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required.  In cases in which the Attorney General directs the United States Attorney or Assistant Attorney General to seek the death penalty, the district court and defense counsel should be given as much opportunity as possible to make proper scheduling decisions.

JUSTICE MANUAL §§ 9-10.030, 9-10.040 & 9-10.150 (emphasis added), available at: https://www.justice.gov/jm/jm-9-10000-capital-crimes#9-10.030

[30] Section 3599 governs the appointment of counsel, investigators, and experts in capital cases.

[31] Available at: https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-17#:~:text=all%20capital%20cases.-

Under the *Justice Manual*, it is irrelevant that no death-penalty-eligible charges were pending at the time that the government filed its original notice in April 2024. The facts alleged in the original indictment about the murders of Victim 3 and Victim 4 as constituting racketeering activity, see ECF No. 1 (¶¶ 24h.-24.p. & ¶¶ 28-31), are essentially the same facts alleged in Counts 2 and 3 of the superseding indictment (alleging violations of 18 U.S.C. § 1959(a)(1)). ECF No. 90, at 17-19. Unquestionably, as counsel for the government and the defense knew in April 2024, the government had the option of filing a superseding indictment then – adding the two death-penalty-eligible § 1959(a)(1) charges ultimately brought in the superseding indictment in May 2025 – but it opted not to do so. And the Capital Case Section in DOJ was aware of what charges the local U.S. Attorney was bringing. *See* JUSTICE MANUAL § 9-10.180 ("Reporting Requirements") ("The Capital Case Section must be immediately notified when . . . an indictment is obtained pertaining *to conduct that could be, but has not been, charged as a capital offense.*") (emphasis added).

Although the statute permits an amendment of a prior notice of the government's intent to *seek* the death penalty based on good cause,[32] this Court should interpret it to prohibit an outright reversal of the government's previously filed formal notice that it would *not* seek the death penalty. Any question about what the statute requires or prohibits should be resolved in a defendant's favor under the rule of lenity (particularly when the death penalty is at issue). *See McNally v. United States*, 483 U.S. 350, 359-360 (1987). Therefore, the filing of the government's original notice in April 2024 forecloses the government's ability under § 3593(a) to file a subsequent, contrary notice

---

,%C2%A7%20610.20%20Judicial%20Conference%20Recommendations,on%20the%20judiciary's%20public%20website.

[32] 18 U.S.C. § 3593(a)(2) ("The court may permit the attorney for the government to amend the notice upon a showing of good cause.").

stating that it would seek the death penalty for the newly-filed death-penalty-eligible charges in a superseding indictment. *See Spurlock*, 2025 WL 1360499, at *21.

For this reason, this Court should strike the government's May 16, 2025 notice – regardless of whether the government's May 16, 2025 notice were timely and supported by good cause (of which it was neither). At the very least, even if not required by the statute itself, this Court should hold – as a matter of this Court's supervisory authority[33] – that, once the government has filed a formal notice of its intent not to seek the death penalty, it may not thereafter seek the death penalty, at least when a defendant has detrimentally relied on the government's original notice that it was not seeking the death penalty (as Mr. Constanza-Galdomez has).

### D. The Government's April 2024 Notice Affirmatively Waived the Government's Ability to File a Notice Under 18 U.S.C. § 3593(a).

Alternatively, even assuming that § 3593(a) does not speak to whether the government can seek the death penalty after filing a contrary, prior notice of intent not to seek the death penalty, the government's April 2024 formal notice affirmatively and irretrievably *waived* its ability to seek the death penalty under § 3593(a). The Supreme Court has explained that "waiver is the intentional relinquishment or abandonment of a known right," which "extinguish[es]" that right. *United States v. Olano*, 507 U.S. 725, 733 (1993) (noting that "forfeiture is the failure to make the timely assertion of a right," while "waiver is the intentional relinquishment or abandonment of a known right"). Both the government and criminal defendants are subject to the waiver doctrine. "[W]hat is sauce for the defendant's goose is sauce for the government's gander." *United States v.*

---

[33] *See Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, (1987) (noting that "the exercise of supervisory authority is especially appropriate in the determination of the procedures to be employed by courts" that "directly concern[] the functioning of the Judiciary"). Significantly, Mr. Constanza-Galdomez is asking this Court to create a procedural rule related to the proper functioning of the federal judiciary in federal capital cases. He is not asking this Court to create a substantive or evidentiary rule. His proposed rule would only prohibit the death penalty when the government previously disclaimed an intent to seek it in a formal filing.

*Caraballo-Cruz*, 52 F.3d 390, 393 (1st Cir. 1995) (referring the waiver). *See, e.g.*, *United States v. Perkins*, 108 F.3d 512, 516 & n.15 (4th Cir. 1997) (applying the same forfeiture/waiver analysis to a claim of error asserted by the government for the first time on appeal as the court applies to a claim raised by a defendant for the first time on appeal).

Section 3593(a) creates not only a "prophylactic right" for a potential capital defendant but also corresponding specific procedural requirements that the government must satisfy in order to seek the death penalty against a defendant. *See United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003). The government's formal statement in a court filing that it does not intend to satisfy those procedural requirements operates as an irrevocable waiver of the government's ability in the future to seek to satisfy those procedural requirements. *Cf. United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) (in discussing the requirement that two counsel – including one "learned counsel" – be appointed in a capital case, 18 U.S.C. § 3005, the court noted "the government's *irrevocable decision* not to pursue the death penalty" when it filed a notice that it was not seeking the death penalty) (emphasis added).

Therefore, the government's formal filing in April 2024 waived the government's ability thereafter to seek to satisfy the requirements of § 3593(a).

### E. The Government Is Estopped from Filing a Notice that It Intends to Seek the Death Penalty Under 18 U.S.C. § 3593(a).

In addition to having waived its ability to file a § 3593(a) notice of its intent to seek the death penalty, the government is estopped from doing so. There are at least three different types of estoppel that apply here – judicial estoppel, equitable estoppel, and promissory estoppel.

### 1. Judicial Estoppel

For essentially the same reasons that the district court gave in applying the judicial estoppel doctrine in *Spurlock*, this Court should hold that the government's May 16, 2025 notice is barred by the judicial estoppel doctrine. *Spurlock*, 2025 WL 1360499, at *17 ("The Court also finds – as a standalone basis for the use of discretion to strike the Death Notice – that the principles of judicial estoppel preclude the government from reversing its formal, timely-filed July No-Seek notice, especially where no case-related developments occurred following the July Notice to bear on the reversal decision."). The court applied the Supreme Court's three-part test set forth in *New Hampshire v. Maine*, 532 U.S. 742 (2001), governing claims of judicial estoppel:

> First, "a party's later position must be clearly inconsistent with its earlier position." [*New Hampshir*e, 532 U.S.] at 743. Second, courts "inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id*. And third, courts ask "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id*.

*Spurlock*, 2025 WL 1360499, at *17.

Applying those three factors, the court concluded that the government's previous filing of a formal notice that it would *not* seek the death penalty estopped it from changing its position many months later and filing a contrary notice of its intent to seek the death penalty. *Spurlock*, 2025 WL 1360499, at *18-*20. The court also stated that:

> The government insists it has not engaged in bad faith because it has not deliberately manipulated the Court or acted with intent to deceive, but only changed position in accordance with new DOJ directives under a new administration. The Court need not and does not reach a finding of misconduct in this narrow sense. But the fact remains that the government decided – certainly not by inadvertence or accident – to reverse course on an issue of critical importance, involving Spurlock's life, less than two weeks before trial, with full knowledge that the reversal would have a chaotic impact on the progression of this case and would make it impossible to proceed to trial on the scheduled date. Under the circumstances, this is certainly tantamount to playing "fast and loose" with the

Court's orders in particular and the judicial process in general; the government's good faith is cold comfort.

*Spurlock*, 2025 WL 1360499, at *20.

This Court should reach the same conclusion in Mr. Constanza-Galdomez's case. First, the government's May 16, 2025 notice is diametrically contrary to the government's prior April 2024 formal notice. Second, this Court relied on the government's April 2024 notice – including by granting the government's four unopposed motions to exclude time under the Speedy Trial Act *after* the April 2024 notice (which were based in part on the fact that the government claimed to have taken the death penalty off the table). This Court also relied on the original notice by scheduling a *noncapital* trial to commence on September 2, 2024, and by managing this case and arranging this Court's calendar (and working with court staff) in reliance on that non-capital trial date. *Cf. Spurlock*, 2025 WL 1360499, at *18 ("The Court has . . . adopted and relied on the July 2024 No-Seek Notice in . . . explicit and implicit ways, many of which the Court has already discussed, throughout the eight months since that decision, including by clearing its calendar [during the trial dates], [and] . . . addressing pretrial timing and motions with a scheduled non-capital trial in mind . . . .").

Third, the government clearly would derive an unfair advantage and it would impose an unfair detriment on the defense if the government is not estopped from seeking the death penalty. As the court in *Spurlock* stated:

[T]he government would clearly "receive an unfair benefit" or "impose an unfair detriment" if not estopped. As Defendant notes, the government provides no real response to the arguments that "the defense would have litigated differently, interviewed witnesses differently, prioritized witnesses differently, approached and hired experts differently – had it not been informed the case was not capital" (ECF No. 409 at 18.) Preparation for a non-capital trial cannot be simply imported into a capital case, with its combined guilt and penalty phases. *See ABA Guidelines*,

> Guideline 10.10.1 (Trial Preparation Overall) (noting that when the government seeks capital punishment, defense "Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies"). In order to present an "integrated defense theory" in a capital case, it is "critical" that such a theory be formulated "well before trial" and reinforced "during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument." *Id.*

*Spurlock*, 2025 WL 1360499, at *18.

Mr. Constanza-Galdomez's detrimental reliance has been even more significant than the defendant in *Spurlock* because, unlike that defendant,[34] Mr. Constanza-Galdomez never has had the assistance of learned counsel, a mitigation specialist, or capital experts at any point. In addition, if they had known this case was going to be a death penalty prosecution later, Mr. Constanza-Galdomez and his counsel would have litigated his case very differently (e.g., interviewed witnesses differently, prioritized witnesses differently, and hired experts differently).

Because, just as in *Spurlock*, the government in this case has played "fast and loose" (*New Hampshire*, 532 U.S. at 750) – resulting in detrimental reliance by Mr. Constanza-Galdomez – the government should be estopped from seeking the death penalty.

## 2. Equitable Estoppel

"To establish equitable estoppel it is not necessary that actual fraud be shown. It is only necessary to show that the person estopped, by his statements or conduct, misled another to his prejudice." *United States for Use and Benefit of Noland Co. v. Wood*, 99 F.2d 80, 82 (4th Cir. 1938); *accord United States for the Use and Benefit of Humble Oil & Refining Co. v. Fidelity and Casualty Co. of New York*, 402 F.2d 893, 897 (4th Cir. 1968).

---

[34] *Spurlock*, 2025 WL 1360499, at *2 (noting learned counsel was appointed for the defendant on August 8, 2023).

"As colleagues at bar and officers of the court, and to ensure the efficient, accurate and just operation of judicial proceedings, counsel must be able reasonably to rely on representations made by fellow counsel in the context of litigation." *Miranda v. Contreras*, 754 A.2d 277, 281 (D.C. App. 2000). Based on the government's formal representation made in April 2024, this Court should apply the equitable-estoppel doctrine as well as the related but distinct judicial-estoppel doctrine. Clearly, when the government filed its April 2024 notice that it would not seek the death penalty, Mr. Constanza-Galdomez and his then sole counsel, Julie Reamy, were misled into believing that the death penalty was off the table and thereby relied to their detriment. In particular, during the 13 months that followed, no preparation for a death penalty trial occurred. Beginning in April 2024, Mr. Constanza-Galdomez also repeatedly consented to the government's motions to exclude time under the Speedy Trial Act based on the government's representation. That prejudice that he suffered is discussed further in Part III.B.3., *supra*, and also in Julie Reamy's April 11, 2025 letter to AUSAs Alex Kalim and Matthew Hoff (**Exhibit C**).

### 3. Promissory Estoppel

The government's May 16, 2025 notice also should be barred under the promissory-estoppel doctrine. The elements of promissory estoppel are (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise. RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979).

The government's August 2024 notice was a "clear and definite promise" that the government would not seek the death penalty; the government had a reasonable expectation that Mr. Constanza-Galdomez and his counsel would rely to their detriment on that promise (by not

seeking appointment of learned counsel, conducting a mitigation investigation, engaging in capital motions practice, or preparing for potential capital charges and a death penalty trial); Mr. Constanza-Galdomez and his counsel did so rely to their detriment on the April 2024 notice for a period of 13 months; and the only manner to avoid this detriment is to enforce the government's promise.[35]

*Black's Law Dictionary* defines a promise as "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." BLACK'S LAW DICTIONARY (10th ed. 2014). The government's formal April 2024 notice – specifically addressing the defense counsel, copying the presiding judge, and filed with the clerk – stated: "We write to inform you that the Attorney General has directed this Office *not* to seek to death penalty against Wilson Arturo Constanza-Galdomez, Edis Omar Valenzuela-Rodriguez, Jonathan Pesquera-Puerto, and Wualter Orellana-Hernandez." ECF No. 48 (emphasis in original). That statement – informally made in AUSA Smolkin's April 7, 2024 email to Julie Reamy (**Exhibit C**, Attachment B) and repeated in the government's motion to exclude time under the Speedy Trial Act filed after the formal notice (ECF No. 49, at 3) – clearly qualified as manifestation of an intention to refrain from acting in a specified manner, conveyed in such a way that Mr. Constanza-Galdomez and his codefendants were justified in understanding that a *commitment* not to seek the death penalty had been made. This is particularly true in view of both (1) the *Justice Manual* provisions quoted *supra* in Part II.B. (about providing notice *one way or the other*, so the court can know whether to appoint learned counsel); and (2) the well-known requirements of federal statutes and Judicial Conference regulations

---

[35] That fact that there was no "consideration" (or mutuality of obligation) does not foreclose the application of the promissory estoppel doctrine. *See, e.g.*, *American Home Assur. Co. v. KBE Bldg. Corp.*, Civil No. CCB-13-1941, 2015 WL 1209940, at *2 (D. Md. Mar. 16, 2015). Indeed, by definition, the promissory estoppel doctrine applies when there is no enforceable promise.

related to learned counsel, mitigation specialists, and the like, which would have applied in the event that the government had announced that it was seeking the death penalty.

***

For these reasons, the government is estopped from seeking the death penalty.

### F. Permitting the Government to Seek the Death Penalty Would Violate the Fifth Amendment's Due Process Clause.

Failure to enforce the government's promise would not only result in a severe inequity (justifying application of the estoppel doctrine); it also would violate due process. *Cf. Santobello*, 404 U.S.at 262 (". . . [A] constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.").

Furthermore, the government's "arbitrary and capricious"[36] conduct in this case – delaying the filing of federal capital charges by nearly five years, coupled with initially having given formal notice that it would *not* seek the death penalty and then reneging on that representation 13 months later – "shocks the conscience" and, thus, violates due process. *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (en banc) (noting that the "kind of executive conduct that fairly can be said to 'shock the conscience' . . . and be 'fatally arbitrary in the constitutional sense' . . . involves 'abusing [executive] power, or employing it as an instrument of oppression'"); *see also Shaffer v. Heitner*, 433 U.S. 186, 212 (1977) (due process violated when the conduct of the government "offends traditional notions of fair play and substantial justice").

---

[36] *United States v. Littrell*, 478 F. Supp.2d 1179, 1192 (C.D. Cal. 2007) (striking the government's "arbitrary and capricious" notice of its intent to seek the death penalty as a violation of due process).

Finally, the circumstances in this case also violate due process in a third way: the government's unjustifiable, prejudicial delay in seeking the death penalty, particularly after initially explicitly announcing that the government would not seek it, has substantially and irreparably prejudiced Mr. Constanza-Galdomez's ability to defend at a capital trial (including, most significantly, at the capital sentencing phase). *Cf. Betterman v. Montana*, 578 U.S. at 448 n.12 ("For inordinate delay in sentencing, although the Speedy Trial Clause does not govern, a defendant may have other recourse, including, in appropriate circumstances, tailored relief under the Due Process Clauses of the Fifth and Fourteenth Amendments. . . .  Relevant considerations may include the length of and reasons for delay, the defendant's diligence in requesting expeditious sentencing, and prejudice.").

### G. Permitting the Government to Seek the Death Penalty Would Violate the Eighth Amendment's Cruel and Unusual Punishments Clause.

It also would violate the Eighth Amendment to permit the government to seek the death penalty in view of its prior explicit waiver 13 months before it abruptly changed its position earlier this month.  What the government has done is both *cruel* (indeed, inhumane) and certainly *unusual*.[37] Such conduct, at the very least, "wantonly"[38] inflicts psychological trauma in violation of the Eighth Amendment.  *See Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Beal v. Foster*, 803 F.3d 356, 357-38 (7th Cir. 2015) (holding that the Eighth Amendment prohibits

---

[37] Before the recent policy of the DOJ to reconsider capital cases in which the previous administration had formally disclaimed its intent to seek the death penalty, the DOJ had never engaged in such a diametric change in position.

[38] *Cf. State of La. ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1949) (plurality) (finding no constitutional violation when a convicted capital defendant initially was unsuccessfully electrocuted as a result of an "unforeseeable accident" and thereafter subject to a second execution date; reasoning that there was no "add[ed] . . . element of cruelty" in the subsequently scheduled execution).  What occurred in the present case was not an "unforeseeable accident."  It was a *deliberate* decision by the Department of Justice.

unjustified infliction of physical *or* psychological pain; citing *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012)).

### H. Permitting the Government to Seek the Death Penalty Would Violate the Equal Protection Guarantee in the Fifth Amendment's Due Process Clause.

Finally, this Court should strike the government's death penalty notice because the executive branch's current publicly-announced policies – expressly prioritizing seeking the death penalty against undocumented immigrants and encouraging reconsideration of the former administration's notices that it was not seeking the death penalty against undocumented immigrants – violates equal protection of the laws. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments. [citations omitted]. Indeed, we have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government.") (citing *Mathews v. Diaz*, 426 U.S. 67, 77 (1976)); *see also United States v. Cisneros*, 363 F. Supp.2d 827, 835 (E.D. Va. 2005) (holding that "a defendant's immigration status is unconstitutionally irrelevant to whether he merits the death penalty"). A prosecutor may not use "an unjustifiable standard such as race, religion, or other arbitrary classification" to determine which crime to charge or which sentence to seek. *Oyler v. Boles*, 368 U.S. 448, 456 (1962). A defendant's lack of lawful immigration status is such an "arbitrary classification."

The evidence in this case does not prove any nexus between Mr. Constanza-Galdomez's unlawful presence in the United States and the alleged offenses. For instance, it is not as if he committed any offenses while in the course of illegally entering into the United States or smuggling undocumented immigrants into this country. Therefore, his lack of lawful immigration status has no legitimate relationship whatsoever to his worthiness for capital punishment. The

government's express policy to prioritize capital prosecutions – and to reconsider the prior administration's publicly-announced decisions not to seek the death penalty – against defendants who were unlawfully present at the time of their alleged offenses is invidious discrimination and, thus, violates equal protection.[39]

## CONCLUSION

The legal dispute at issue is not merely about a violation of Mr. Constanza-Galdomez's rights.  Instead, "[a]t stake is the honor of the government [and] public confidence in the fair administration of justice . . . ."  *Carter*, 454 F.2d at 428 (4th Cir.) (en banc).  For the foregoing reasons, this Court should strike the government's May 16, 2025 notice (ECF No. 94), with prejudice.

Respectfully submitted,

/s/ *Brent E. Newton*
Brent E. Newton
District of Maryland Bar # 21304
brentevannewton@gmail.com
19 Treworthy Road
Gaithersburg, MD 20878
202-975-9105

Julie M. Reamy
District of Maryland Bar # 28232
juliereamy@gmail.com
One Olympic Place, Suite 900
Towson, MD 21204
(410) 605-0000

**Counsel for Defendant Wilson
Arturo Constanza-Galdomez**

---

[39] President Trump's executive order and Attorney General Bondi's directive sufficiently prove that the government's decision to seek the death penalty against Mr. Constanza-Galdomez was motivated, at least in part, by his unlawful immigration status.  If the government disputes this fact, this Court should order discovery and conduct an evidentiary hearing on that issue – as the executive order and directive clearly make out more than the type of prima facie case required for discovery. *Cf. United States v. Bass*, 536 U.S. 862 (2002) (per curiam) (denying discovery and an evidentiary hearing where defendant offered insufficient proof that the federal death penalty was being enforced in a discriminatory manner against black defendants).

## CERTIFICATE OF CONFERENCE

On May 26, 2025, I conferred with counsel for the government, AUSA Kalim, who informed me that the government opposes this motion.

/s/ *Brent E. Newton*
Brent E. Newton

## CERTIFICATE OF SERVICE

On May 27, 2025, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

/s/ *Brent E. Newton*
Brent E. Newton