IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * |
| WILSON ARTURO CONSTANZA-GALDOMEZ, *et al.*, | * CRIMINAL NO. SAG-22-0409 |
| Defendants. | * |

******

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO STRIKE NOTICES OF INTENT TO SEEK THE DEATH PENALTY**

The United States of America respectfully submits this response in opposition to the Defendants' Motions to Strike the Government's Notices of Intent to Seek the Death Penalty. ECF Nos. 101, 105, 106.

## BACKGROUND

On November 30, 2022, a federal grand jury in the District of Maryland returned an indictment against Defendants Wilson Arturo Constanza-Galdomez, Edis Omar Valenzuela-Rodriguez, and Jonathan Pesquera-Puerto for conspiracy to participate in a racketeering enterprise ("RICO conspiracy") in violation of 18 U.S.C. § 1962(d).[1] ECF No. 1. According to the indictment, from at least 2019 to 2021, the Defendants were members of MS-13, an international criminal organization that operates in the United States. The indictment alleged that, among other violent acts, the Defendants were responsible for the murders of Victim 3 in May 2020 and Victim 4 in June 2020.

---

[1] The grand jury also charged a fourth defendant, Wualter Orellana-Hernandez, who pled guilty in October 2024. *See* ECF No. 63.

1

On April 22, 2024, the prosecution team filed a notice that then-Attorney General Merrick B. Garland had directed prosecutors not to seek the death penalty against the Defendants.[2] ECF No. 48. The Court has scheduled a jury trial to begin on September 2, 2025. ECF No. 61.

On February 5, 2025, Attorney General Pamela Bondi issued a memorandum entitled, *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions*.[3] Section III of the memorandum directed the Capital Review Committee to review no-seek decisions in all pending capital-eligible cases charged since January 20, 2021:

> The Attorney General's Capital Review Committee is directed to review no-seek decisions in all pending capital-eligible cases (*i.e.*, death-eligible cases that have not yet resulted in a conviction) charged between January 20, 2021, and January 19, 2025. This group shall reevaluate no-seek decisions and whether additional capital charges are appropriate. Particular attention shall be paid to cases involving defendants associated with cartels or transnational criminal organizations, capital crimes committed by defendants present in the United States illegally, and capital crimes committed in Indian Country or within the federal special maritime and territorial jurisdictions. The review required by this paragraph shall be completed within 120 days.

On April 1, 2025, a member of the Department of Justice's Capital Case Section ("CCS") advised the prosecution team that the Capital Review Committee had selected this case for further evaluation. *See* ECF Nos. 73, 75. On April 23, 2025, CCS convened a meeting in Washington, D.C., with the prosecution team and defense counsel, to discuss the evaluation of the Defendants' case and any arguments for mitigation. *See* ECF No. 93.

On May 8, 2025, the grand jury returned a superseding indictment against the Defendants, which added substantive counts for the murders of Victims 3 and 4 in aid of racketeering activity

---

[2] Although 18 U.S.C. § 1962(d) is not a capital charge, the case was submitted for capital case review because a death-eligible charge could have been charged.

[3] A copy of the Attorney General's memorandum is publicly available on the Department of Justice's website at the following URL: https://www.justice.gov/ag/media/1388561/dl (last visited June 3, 2025).

("VICAR murder") in violation of 18 U.S.C. §§ 1959(a)(1) and 2. The superseding indictment also contained a notice of special findings as to the offenses being death-penalty eligible pursuant to 18 U.S.C. §§ 3591 and 3592. Shortly afterward, the Court ordered the prosecution team to notify the Court of its intention, if any, to seek the death penalty by May 16, 2025. *See* ECF No. 93.

On May 15, 2025, Attorney General Bondi directed the prosecution team to seek the death penalty against the Defendants. On May 16, 2025, the prosecution team filed separate death notices for each Defendant. *See* ECF Nos. 94, 95, 96. On May 27, 2025, in accordance with an expedited briefing schedule ordered by the Court, Constanza-Galdomez filed a motion to strike the death notices, which Valenzuela-Rodriguez and Pesquera-Puerto joined. *See* ECF Nos. 101, 105, 106.

**ARGUMENT**

**I.      THE DEATH NOTICE TIMING IS OBJECTIVELY REASONABLE.**

The Federal Death Penalty Act (the "FDPA") requires the Government, at "a reasonable time before the trial," to provide a notice that (1) states that the Government believes a sentence of death is justified and will seek the death penalty if the defendant is convicted, and (2) "set[s] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a). These provisions mandate nothing more than that the notice informs the defendant that the death penalty will be sought and identifies the aggravating factors upon which the Government will rely. In this case, the Government complied with this requirement on May 16, 2025, when it filed the death notices for each Defendant. *See* ECF Nos. 94, 95, 96.

The FDPA places a single temporal limitation on the filing of any death notice: the Government must file its notice "a reasonable time before the trial or before the acceptance by the court of a plea of guilty." 18 U.S.C. § 3593(a). In the Fourth Circuit, determining whether the timing is reasonable involves "an inquiry into the objective reasonableness of the time between issuance of the Death Notice and the trial itself, in light of the particulars of the charged offense and the anticipated nature of the defense." *United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003). This inquiry involves the following factors: "(1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings."[4] *Id.* at 737. The Death Notice is reasonably timely when "sufficient time exists following notice and before trial for a defendant to prepare his death defense." *Id.*; *see also* S. Rep. No. 101-170, at 21 (1989) (explaining in Senate Judiciary Committee report on precursor to FDPA that the "reasonable time" requirement "is intended to ensure that the defendant has adequate notice so that he or she can prepare for the post-conviction sentencing hearing and can conduct an appropriate *voir dire* of the

---

[4] Outside the Fourth Circuit, *Ferebe* has not found traction, since nothing in § 3593's text restricts courts to counting only the interval between the time the notice was filed and the trial date at the time of that filing. In other Circuits, a continuance is the proper remedy if the defendant believes a notice is filed too close to trial. *See, e.g.*, *United States v. Wilk*, 452 F.3d 1208, 1224–25 (11th Cir. 2006) ("Allowing continuances after the Death Notice is filed (1) permits the government to receive input from defense counsel and to make the death penalty decision with full and cautious deliberation, while still (2) accomplishing the goal of § 3593(a) to assure that defendants have adequate time to prepare a defense to the death penalty and do not stand trial for their life without reasonable notice."); *see also United States v. Williams*, 318 F. App'x 571, 572–73 (9th Cir. 2009) (explaining that timeliness concerns of a notice filing can be addressed by a continuance); *United States v. Pepin*, 367 F. Supp. 2d 315, 319 (E.D.N.Y. 2005) (same). The United States maintains that *Ferebe* is wrong and that § 3593, properly construed, measures the reasonableness of the "time before the trial" based on when the defendant actually goes to trial after the filing of a death notice. So, if the defendant needs more time to adequately prepare for trial once a death notice is filed, the district court may remedy any reasonableness concerns by continuing the trial. We make this argument for purposes of preserving it for possible further review.

prospective jurors"). Given these factors, the death notices are reasonably timely.

*Nature of the charges.* As to the nature of the charges, although the Defendants are now charged with two capital offenses, the capital offenses are based on the same facts and evidence that already form the basis of the Defendants' RICO conspiracy charge, which has been pending since 2022. In the original indictment, the murders of Victims 3 and 4 were alleged as overt acts in furtherance of the RICO conspiracy and then reiterated as special sentencing factors. *See* ECF No. 1, at ¶¶ 25.h–p, 28–31. The capital offenses add no new victims or facts. Plus, RICO and VICAR are companion statutes with overlapping elements. Both require the Government to make factual showings as to an enterprise, the defendants' relationship to that enterprise, and certain racketeering acts. The nature of the charges is no more complex today than it was before. Constanza-Galdomez's inconsistent line of thinking underscores this point. At first, he asserts "the charges are complex." ECF No. 101, at 13. Later, however, he concedes that "[t]he facts alleged in the original indictment about the murders of Victim 3 and Victim 4 as constituting racketeering activity are essentially the same facts alleged in Counts 2 and 3 of the superseding indictment." *Id*. at 34 (internal citation omitted). Because the Defendants have been preparing to defend themselves against these murder allegations for the past 2.5-plus years, the nature of the charges, which have largely stayed the same, weighs in favor of concluding that the notices are reasonably timely.

*Nature of the aggravating factors.* Similarly, the nature of the aggravating factors cited in the Death Notices were virtually all contained in the allegations set forth in the overt acts and special sentencing factors sections of the original indictment. *Compare* ECF No. 1, at ¶¶ 25.h–p, 28–31, *with* ECF Nos. 94, 95, 96. Most of the aggravating factors in the notices highlight that the Defendants intentionally killed the Victims after substantial planning and premeditation and did

5

so in an especially heinous, cruel, or depraved manner. *See* ECF Nos. 94, 95, 96. The original indictment alleged those factors by stating that, as part of their RICO conspiracy, the Defendants murdered the Victims "willfully, and with deliberately premediated malice," by luring them to specific locations "for the purpose of murdering" them, murdering them by "stabbing [them] numerous times with knives" or other "sharp objects," and then using the murders "to get credit for participating and to increase their status within MS-13." ECF No. 1, at ¶¶ 25.i–j, 25.l, 25.n–p, 29, 31. In preparing to defend against those allegations in the original indictment, the Defendants also prepared to defend against most of the aggravating factors in the Death Notices. Perhaps only the Victims' relative youth and the injury, harm, and loss the Victims' family and friends suffered were not expressly alleged in the original indictment, but those aggravating factors were already known to the Defendants. They certainly knew the Victims' ages from discovery. And they certainly were not blind to victim impact as an important sentencing factor in any case involving allegations of intentional murder. *Cf. Payne v. Tennessee*, 501 U.S. 808, 820 (1991) ("Wherever judges in recent years have had discretion to impose sentence, the consideration of the harm caused by the crime has been an important factor in the exercise of that discretion."). Nor have they articulated how additional time before trial would help them prepare for this aggravating factor. Again, allegations of the intentional murder of Victims 3 and 4 have been present in the Defendants' RICO conspiracy charge from the very beginning of this case. Although the Defendants contend that significant time and resources would have to be devoted to defend against those aggravating factors, much of the mitigation investigation is inherent to formulating defenses to what was alleged in the original indictment. *See, e.g.*, *United States v. Le*, 311 F.Supp.2d 527, 535 (E.D. Va. 2004) (explaining that the "aggravating factors require no additional investigation" because "an investigation into the facts and circumstances of charges in the indictment would

6

undoubtedly take place in any event in preparation for [the defendant]'s defense to these capital charges during the guilt phase of trial").

***Time remaining before trial.*** As to the available time remaining before trial, given the variables at play in a death penalty case, courts have not set a brightline rule for the reasonability of notice filing, approving as reasonable the filing of a death notice in a substantially similar case 113 days before trial. *See Le*, 311 F. Supp. 2d at 534-35 (finding 113 days reasonable); *see also Ferebe*, 332 F.3d at 725 (noting a nationwide average of 8.4 months); *United States v. Wilk*, 452 F.3d 1208, 1221 (11th Cir. 2006) (finding six months reasonable); *United States v. Breeden*, 366 F.3d 369, 374 (4th Cir. 2004) (same); *United States v. Ponder,* 347 F. Supp. 2d 256, 270 (E.D. Va. 2004) (finding four months reasonable); *cf. United States v. McGriff*, 427 F. Supp. 2d 253, 270-72 (E.D.N.Y. 2006) (finding 12 days unreasonable but granting continuance to cure prejudice). As Constanza-Galdomez acknowledges, at the time the Government filed its May 16, 2025, notices, there were 109 days remaining until the September 2, 2025, trial date.

The Court should find that the filing of the death notices 109 days before trial also weighs in favor of concluding that they were reasonably timely. The capital offenses in the superseding indictment simply charge as VICAR murder two of the racketeering acts alleged in the original indictment's RICO conspiracy charge. So, it cannot be said that the Defendants—each represented by their own counsel—do not have adequate time to prepare their defenses. They repeatedly assert that they must "*start entirely from scratch*" now that there will be a separate penalty phase (where death is on the table) if they are convicted at the guilt phase. ECF No. 101, at 18, 23. They indicate that they must rethink their defenses because they should not take "contradictory positions" at the guilt and penalty phases of the capital trial. *Id.*, at 22. But they do not say that they were planning to take contradictory positions at trial and sentencing before the death notices were filed. And it

7

is hardly clear how they could have done so in this case. Under the original indictment, this was not a multi-count case where the Defendants could have conceded guilt to some lesser charges in the hope that the jury would acquit them of the greater charges. There was only one charge: RICO conspiracy, where all the alleged overt acts were either murder, attempted murder, or aggravated assault offenses fueled by their gang membership in MS-13. And the Defendants engage in hyperbole when they claim that *any* learned counsel needs "*at least* [one] year, and often more, to effectively investigate and develop mitigation" for a capital case. ECF No. 101, at 21. Back in 2003, when research and investigations were still more analog than digital, the defendant in *Ferebe* pointed to the "average of 8.4 months remaining before trial" as an adequate amount of time to prepare for a capital case. *See* 332 F.3d at 725. So, it is very hard to see how the tremendous technological advances of the past two decades have made it substantially more difficult to prepare for a capital trial—especially where, as here, counsel have had more than 2.5 years to investigate and prepare to defend against virtually the same set of underlying facts. The onus should be on the Defendants to explain why preparing for capital trials now take substantially longer, but instead of doing so, they hide behind general statements about lengthy preparations that could apply to any case, and thus reveal nothing about why the notices should be deemed untimely in this case. Therefore, the Defendants' position that 109 days is simply insufficient to permit an adequate defense at a capital murder trial should be rejected.

***Status of discovery.*** The Government agrees with Constanza-Galdomez that the overwhelming majority of discovery in this case has been tendered. Doc. No 101, at 24.

II. **SECTION 3593(a) IS SILENT ON THE QUESTION OF REVERSAL OF PRIOR DECISIONS BY DOJ NOT TO SEEK THE DEATH PENALTY, AND THE GOVERNMENT DID NOT AFFIRMATIVELY WAIVE THE ABILITY TO FILE A NOTICE.**

No statutory provision requires the Government to formally file notice of a decision not to seek the death penalty. Admittedly, once it announces a decision to seek death, the Government may amend the aggravating factors upon which it relies to justify a sentence of death for good cause shown.[5] 18 U.S.C. § 3593(a). But no statutory provision obliges it to justify a decision to pursue capital punishment in the first instance, after initially indicating it would not. The Government would have to honor an *agreement* not to seek the death penalty in exchange for consideration, like a guilty plea, but the announcement of a decision to forgo capital punishment in this case did not hinge on anything of value from the Defendants. *See* ECF No. 47. They, therefore, have no right to enforce the prosecution's earlier representation. *Cf. United States v. Hodge*, 412 F.3d 479, 485 (3d Cir. 2005) (noting the Government must strictly adhere to *bargains* it strikes with defendants (emphasis added)). And in notifying the Court and Defendants that then-Attorney General Garland directed the United States not to seek the death penalty, the United States did not engage in the "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (discussing difference between forfeiture and waiver of a defendant's rights). Nothing in the then-Attorney General's direction said or implied anything about his ability, not to mention a future Attorney General's ability, to reconsider that decision. And just as this Court possesses the "inherent power" to "reconsider" its decisions, *United States v. Breit*, 754 F.3d 526, 530 (4th Cir. 1985), so do the Attorney General and Department of Justice

---

[5] Like the reasonable time requirement, § 3593's good cause standard protects against undue delay and unfair prejudice to a defendant facing a capital trial. *See United States v. Le*, 326 F. Supp. 2d 739, 741-42 (E.D. Va. 2004). Those concerns are not implicated if the Government, having previously announced it will not seek the death penalty, gives notice that it will a reasonable time before trial.

9

because "[t]he power to reconsider is inherent in the power to decide." *In re Vivint, Inc.*, 14 F.4th 1342, 1351 (Fed. Cir. 2021); *cf. Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) ("The authority [to cancel its trademark registrations] comes from the USPTO's inherent discretion to correct its own errors and to manage its own docket."). Moreover, because the Executive Branch has "exclusive authority and absolute discretion" to decide which crimes to prosecute, including the capital charges in the superseding indictment, *Trump v. United States*, 603 U.S. 593, 620 (2024) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)), the Court should not read into an exercise of the Executive's discretion a waiver of its right to reconsider that decision. In fact, the Attorney General has established procedures by which—at the request of the prosecution or defense—the Department will consider whether to withdraw a prior notice of intent to seek the death penalty. *See generally* Justice Manual § 9-10.160. And no one has ever suggested that by filing one notice the Attorney General waived the right to reconsider and reverse that decision, which is all that Attorney General Bondi has done here. *Cf. United States v. Peoples*, 360 F.3d 892, 896 (8th Cir. 2004) (affirming the denial of a motion to strike a death notice where the United States filed the death notice, withdrew it at the penalty phase of the original trial, and then refiled it when the case was later retried).

As such, this Court should not find waiver in the Government's previously announced decision to forgo a capital prosecution in this case. Indeed, it is difficult to see how the decision not to seek death in a case involving no capital charges, *see* ECF No. 1; *see also* 18 U.S.C. § 1963(a), waives the right to seek death on subsequently filed capital charges.

The Defendants also ask the Court to "create a procedural rule" under its "supervisory authority" that "prohibit[s] the death penalty when the government previously disclaimed an intent to seek it in a formal filing." ECF No. 101, at 35 n.33; *see also Bank of N.S. v. United States*, 487

U.S. 250, 254 (1988) (stating that federal courts may use their "supervisory authority" to "formulate procedural rules"). But the rule they are advocating for is substantive because it would place a substantive limit on what the government may do once it files a no-seek notice—a limit that no amount of process could overcome. Imposing such a substantive rule would be an abuse of any supervisory authority this Court might have.

As a broad policy matter, moreover, the Court should not strike or bar the death penalty on the basis of the circumstances here. Courts have repeatedly equated the striking of a notice of intent to seek the death penalty with dismissal of an indictment or some part of one. *See United States v. Lopez-Matias*, 522 F.3d 150, 152-53 & n.6 (1st Cir. 2008) (collecting cases regarding interlocutory jurisdiction and observing that "in dismissing the Notice, the district court effectively dismissed a significant portion of the counts against the defendant" (internal quotes omitted)); *accord United States v. Frye*, 372 F.3d 729, 733 (5th Cir. 2004). Dismissal is among "the most draconian sanctions" and ordinarily employed "only when a plaintiff's misconduct is extreme." *Vázquez-Rijos v. Anhang*, 654 F.3d 122, 127 (1st Cir. 2011) (quoting *Young v. Gordon*, 330 F.3d 76, 81 (1st Cir. 2003)); *see also United States v. Santana*, 6 F.3d 1, 11 (1st Cir. 1993) (noting that courts should "refrain from using the supervisory power to conform executive conduct to judicially preferred norms by dismissing charges, absent cognizable prejudice to a particular defendant").

Here, the Government has not engaged in any misconduct, much less any misconduct that would merit the most draconian of sanctions. Rather, the Government is merely responding to a new directive from the Attorney General. In short, the Government has not engaged in any conduct that should merit a sanction, much less one that would have a preclusive impact on its ability to pursue the full panoply of penal consequences, particularly when any potential timeliness issue could be cured by a continuance.

The imposition of a bar would constitute a draconian sanction in a circumstance in which the Government has done nothing to merit any sanction at all.

## III. THE GOVERNMENT IS NOT ESTOPPED FROM FILING A DEATH NOTICE.

Along those same lines, no theory of estoppel (judicial, equitable, or promissory) applies here. Judicial estoppel is explained as follows:

> Judicial estoppel is a principle developed to prevent a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court. *See John S. Clark Co. v. Faggert & Frieden, P.C.,* 65 F.3d 26, 28 (4th Cir.1995). Three elements must be satisfied before judicial estoppel will be applied. "First, the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation." *Lowery v. Stovall,* 92 F.3d 219, 224 (4th Cir.1996). The position at issue must be one of fact as opposed to one of law or legal theory. *Id.* "Second, the prior inconsistent position must have been accepted by the court." *Id.* Lastly, the party against whom judicial estoppel is to be applied must have "intentionally misled the court to gain unfair advantage." *Tenneco Chems., Inc. v. William T. Burnett & Co.,* 691 F.2d 658, 665 (4th Cir.1982). This bad faith requirement is the "determinative factor." *John S. Clark Co.,* 65 F.3d at 29.

*Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007).

For equitable estoppel, "it is only necessary to show that the person sought to be estopped, by statements or conduct, misled another to his prejudice. As against the government, estoppel may only be justified, if ever, in the presence of affirmative misconduct by government agents." *Casa de Md. v. U.S. Dep't of Homeland Security*, 24 F.3d 684, 705 (4th Cir. 2019) (cleaned up).

Finally, where the theory of promissory estoppel applies, it requires "a clear and definite promise." *Expo Props., LLC v. Experient, Inc.*, 956 F.3d 217, 225 n.6 (4th Cir. 2020) (citations omitted).

Here, the Government is not seeking to adopt a factual position that is inconsistent with a stance taken in prior litigation. Back when there were no death-eligible charges on the table, *see United States v. Huskey*, 90 F.4th 651, 674 (4th Cir. 2024) (explaining that even when RICO

violations are based on "the racketeering activity of murder," defendants are subject to a "maximum sentence [of] life imprisonment" under 18 U.S.C. § 1963(a)), the United States said that it did not intend to seek the death penalty. *See* ECF No. 48. And even if there had been death-eligible charges in the original indictment, *see* ECF No. 1, the decision to not seek the death penalty at a given point in time is not the sort of decision that can lead to estoppel. It is not a position on an "issue . . . of fact." *Zinkand*, 478 F.3d at 638. Whether the Defendants should be charged with capital offenses and warrant death if convicted are not issues of fact but judgment—judgments which are entrusted as a constitutional matter to the "exclusive authority and absolute discretion" of the Executive. *See Trump*, 603 U.S. at 620. This is fundamentally a charging decision that is no different from the decision to bring (or not bring) certain charges at a given time. The United States is unaware of any caselaw—and the Defendants have not cited any—that indicates that the government may be estopped from bringing more serious charges once it has announced its intent not to bring such charges at some point in the past. Absent truly extraordinary circumstances not present here, any judicial decision suggesting otherwise would pose separation-of-powers concerns.

What is more, at no point did the United States mislead the parties or Court, nor did it engage in any affirmative misconduct. The Attorney General has simply reconsidered an earlier decision, which it is her prerogative to do, and exercising that inherent authority is not misconduct but basic management and governance. And at no point did the Government make an enforceable promise. Deciding not to seek certain charges is not a promise not to do so. The Government, in superseding the original indictment in this case, was simply augmenting its prior criminal case by adding substantive, death-eligible offenses in Counts Two and Three. Constanza-Galdomez agrees that, "[o]ther than adding those two new charges and removing reference to former Codefendant

Orellana-Hernandez, the superseding indictment added no new facts to the original indictment." ECF No. 101, at 10. Again, he cites no binding authority (or, in some instances, no authority at all) for why estoppel principles should encroach upon the Executive's discretion to reconsider a no-seek decision. The prior position not to seek the death penalty was not formally accepted by the Court. It was not the subject of any motion or order because whether the United States intends to bring capital charges and seek the death penalty is, as noted, exclusively within the Executive's discretion. *See Trump*, 603 U.S. at 620. Finally, the Government has not intentionally misled the Court or Defendants to gain an unfair advantage in this case. The no-seek notice was not filed with the intent that a death notice would later be filed. And when Attorney General Bondi reconsidered and reversed Attorney General Garland's no-seek decision, that represented a proper exercise of her discretion and judgment. It did not make Attorney General Garland's prior decision intentionally misleading; nor could it have. And for those reasons, no plausible claim of bad faith exists.

## IV. THE DEATH NOTICES DO NOT VIOLATE THE FIFTH OR EIGHTH AMENDMENTS.

Finally, Constanza-Galdomez argues that the death notices violate different aspects of the Fifth and Eighth Amendment. Each of these arguments lack merit.

First, many of Constanza-Galdomez's arguments rest, in some degree, on mischaracterizing the Government's prior no-seek notice as a "promise" or likening the no-seek notice to a plea agreement. As explained above, the no-seek notice was not a promise. It was not negotiated for consideration, making it an agreement, and nothing in § 3593(a) prevents the Government from reconsidering its decision whether to seek the death penalty or not.

Second, the decision to reconsider was neither arbitrary nor capricious. The FDPA itself provides sufficient limits on the discretion of sentencing bodies to withstand constitutional

scrutiny. *See Gregg v. Georgia*, 428 U.S. 153, 195 (1976). ("[T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."); *Jones v. United States*, 527 U.S. 373 (1999) (recognizing the constitutionality of the Federal Death Penalty Act). Beyond that, the Capital Case Protocol ensures proper individualized consideration of the appropriate factors relevant to a case. Constanza-Galdomez cites no binding case law to undermine those propositions. Moreover:

> [A prosecutor's] broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte v. United States*, 470 U.S. 598, 607 (1985).

This discretion is, of course, not unfettered. A prosecutor may not seek greater punishment based on a defendant's exercise of a constitutional right. A prosecutor must also not pursue charges based on a discriminatory motive. Here, nothing has been submitted to show or suggest that the death notice was filed because of any discriminatory motive, invidious classification or improper motivation as to the Defendants. Those are the only grounds which appear to warrant judicial interdiction of such action by an officer of the executive branch of government.

Third, the delay alone, or the inability to prepare based on the timing, does not amount to a constitutional violation. Indeed, in most Circuits, death notices filed close to trial are remedied through continuances. "The obvious intent of section 3593(a) is to ensure that both parties, especially the defendant, have adequate time to prepare for a capital trial." *United States v. Williams*, 318 F. App'x 571, 573 (9th Cir. 2009). A district judge can ensure a defendant's rights are protected under section 3593(a) by continuing trial. *See id.*; *see also Wilk*, 452 F.3d at 1223

("the obvious purpose of the § 3593(a) notice requirement is to make sure a defendant has adequate time to prepare for a death defense. Continuing the trial after the Death Notice is filed does not undermine but rather preserves the defendant's statutory right not to stand trial for his life without reasonable notice of the government's intent to seek the death penalty.").

Fourth, and along the same lines, the decision to reconsider a no-seek decision is neither cruel nor unusual. Constanza-Galdomez cites no law for the proposition that facing the possibility of the death penalty, following prior information regarding the Government's earlier intent not to seek the death penalty, constitutes cruel and unusual punishment.

Fifth, the Administration's announced policies do not violate equal protection laws. The Attorney General's memorandum directed the review of all pending death-eligible cases. It does not violate equal-protection principles that the Attorney General has decided that absent significant mitigating circumstances, federal prosecutors are expected to seek the death penalty in cases involving capital crimes committed by aliens who are illegally present in the United States and other categories of capital crimes, such as those involving the death of a law enforcement officer. Being an illegal alien is not a suspect classification, nor is it a classification that discriminates on the basis of immutable characteristics like race or national origin. Instead, it identifies defendants on the basis of prior criminal conduct—entering or remaining in the United States illegally—which is an eminently reasonable basis on which to make basic charging decisions.[6] And Defendants do not argue that prior criminal conduct ceases to be a valid, constitutional basis for charging decisions once the decision involves the death penalty.

---

[6] Indeed, the statutory mitigating and aggravating factors specifically contemplate the important role of an individual's criminal history in the death penalty evaluation. *See, e.g.*, 18 U.S.C. §§ 3592(a)(6) (no prior criminal history); (b)(1) (prior espionage or treason conviction); (c)(2) (prior conviction of violent firearm felony), (3) (prior conviction of crime with death or life penalty), (4) (previous conviction of other serious offenses), (12) (conviction for serious federal drug offenses), (15) (prior conviction of sexual assault or child molestation).

## **CONCLUSION**

For these reasons, the motions to strike should be denied.

                                                Respectfully submitted,

                                                Kelly O. Hayes
                                                United States Attorney

                        By:     /s/ Alex Kalim
                                                Alex Kalim
                                                Assistant United States Attorney
                                                36 S. Charles Street, 4th Floor
                                                Baltimore, Maryland 21201
                                                Tel.: (410) 209-4800
                                                Fax: (410) 962-3124
                                                Alex.Kalim@usdoj.gov

Dated:  June 4, 2025